**Gerald M. SMITH, By and Through the MISSOURI PUBLIC DEFENDER COMMISSION and Joseph W. Downey, Public Defender for the Twenty-second Judicial Circuit of Missouri, as Next Friends, Appellants,**

v.

**William ARMONTROUT, Appellee.**

**No. 86–1457.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1986.

Decided March 2, 1987.

Rehearing and Rehearing En Banc Denied April 8, 1987.

Jordan Cherrick, St. Louis, Mo., for appellants.

Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before ARNOLD, JOHN R. GIBSON, and FAGG, Circuit Judges.

ARNOLD, Circuit Judge.

Appellants Missouri Public Defender Commission and Joseph W. Downey[1] seek to present a next-friend petition for habeas corpus under 28 U.S.C. § 2254 on behalf of Gerald M. Smith, a death-row inmate at the Missouri State Penitentiary who declared that he wished to cease pursuit of post-conviction relief and proceed to his execution. The District Court[2] dismissed the next-friend petition for lack of standing, ruling that under *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (per curiam), Smith possessed the requisite mental competence to abandon his post-conviction remedies, and that his decision to do so was voluntary. 632 F.Supp. 503 (W.D.Mo.1986). We affirm.[3]

## I.

### A.

In 1981, Gerald Smith was convicted and sentenced to death for the 1980 slaying of Karen Roberts in St. Louis, Missouri. Since Smith's conviction, a direct appeal and several state- and federal-court collateral proceedings attacking the conviction and sentence have been filed by Smith or by his brother, Eugene Smith, Jr., acting as a next friend. From the time of the conviction to the filing of the present habeas corpus petition, Smith changed his mind about the desirability of post-conviction relief at least eight times.

Smith shifted his position on this question several times during the course of his direct appeal. However, the Missouri Supreme Court ruled that the appeal was mandatory; it went on to affirm Smith's capital murder conviction and death sentence. *State v. Smith*, 649 S.W.2d 417 (Mo.1983) (en banc). Smith approved the filing of a petition for a writ of certiorari, but the Supreme Court denied his petition. *Smith v. Missouri*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Smith initially opposed pursuing collateral review, then relented and permitted his attorney to file for relief in a Missouri circuit court under Mo.S.Ct.R. 27.26, and then moved that the petition be dismissed. In October 1984, the state circuit court granted Smith's motion, ruling that Smith was competent to abandon the proceeding, though it held no formal adversarial hearing on competence.[4] Days later, the Missouri Supreme Court affirmed the dismissal and set Smith's execution for November 9, 1984.

Eugene Smith then filed a next-friend petition in the District Court, which stayed Smith's execution pending a competency hearing. 604 F.Supp. 840 (1984). Gerald Smith thereafter elected to resume pursuit of his remedies, and was substituted for Eugene Smith as sole petitioner. However, the District Court determined that Smith had not exhausted his state-court remedies,

---

**1.** Eugene Smith, Jr., who is Gerald Smith's brother, originally filed this petition. During the pendency of this appeal, the District Court granted Eugene Smith's request to be relieved of his duties as next friend, and we granted the current appellants' request to be substituted as next friends for Gerald Smith.

**2.** The Hon. Scott O. Wright, Chief Judge, United States District Court for the Western District of Missouri.

**3.** After this appeal was filed, Smith wrote a letter to the Clerk of this Court stating that he now wishes to prosecute his habeas corpus petition. This letter and its effect on the issues before us are discussed later in this opinion.

**4.** The circuit court did have before it the report of one psychiatrist who believed Smith competent, and also heard Smith testify in response to his own attorney's questions. Not before the court were two other then-extant psychiatrists' reports which concluded that Smith was incompetent. 632 F.Supp. at 505 n. 1.

and dismissed his claims without prejudice pursuant to *Rose v. Lundy,* 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). Then, because Gerald Smith had again recanted and decided to abandon further attacks on his conviction, Eugene Smith filed a next-friend petition in the state circuit court. See Mo.S.Ct.R. 27.26 and 52.02. The Missouri Supreme Court, however, refused to stay Smith's execution, holding that the Rule 27.26 petition was a nullity on the ground that the October 1984 state circuit court determination that Smith was competent barred further inquiry into the matter; the Court stated that it would grant no further extensions of Smith's execution date.

Eugene Smith returned to the District Court, filing the petition now before us, in which he alleged that his brother was not competent and that his decision was not voluntary. As grounds for overturning Gerald Smith's conviction and sentence, Eugene Smith alleged, *inter alia,* that Missouri's death-penalty procedures violate the Eighth and Fourteenth Amendments, and that Smith did not have effective assistance of counsel at trial. The District Court stayed Smith's execution pending an up-to-date evaluation of his competence, and ordered him transferred to the Federal Medical Center in Springfield, Missouri, for examination and testing.

### B.

■ A person generally lacks standing to prosecute a federal habeas corpus petition on behalf of another unless he or she can show a reasonable excuse as to why the detainee did not sign and verify the petition, and a sufficient relationship and interest linking the would-be next friend to the detainee. *Weber v. Garza,* 570 F.2d 511, 513–14 (5th Cir.1978); see *Gilmore v. Utah,* 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976); 28 U.S.C. § 2242 ("[a]pplication for writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf.") The sufficiency of Eugene Smith's relationship with his brother was, of course, undisput-

ed, so the District Court hearing, which began February 18, 1986, focused upon Smith's decision to waive further proceedings. This inquiry resolved into two questions: first, whether Smith had the capacity to appreciate his position and make a rational decision, or was suffering from a mental disease, disorder, or defect that substantially affected his capacity, see *Rees v. Peyton,* 384 U.S. at 314, 86 S.Ct. at 1506; and second, whether the conditions of Smith's confinement rendered his decision involuntary. See *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Groseclose ex rel. Harries v. Dutton,* 594 F.Supp. 949, 953, 957, 961 (M.D. Tenn.1984).

Gerald Smith testified in the District Court that the reason for his decision to acquiesce in the imposition of his death penalty was that he hated confinement and preferred death to life imprisonment. Smith observed that the most he could hope to gain through post-conviction proceedings would be a new trial, that in a new trial he would have no realistic chance of avoiding a guilty verdict, and that the lightest sentence he could receive would be life imprisonment without parole for 50 years. See R.S.Mo. § 565.008.

Besides Smith's testimony, the Court received a variety of evidence that assisted it in evaluating his decision and the rationale he articulated for it. There was evidence from a number of sources concerning Smith's life and medical history. The Court heard live or videotaped expert testimony from six psychiatrists who had examined Smith to evaluate his competency; it also received these witnesses' written reports, as well as those of two psychiatrists and one psychologist who did not testify. Finally, Missouri prison officials and two death-row inmates testified about Smith's behavior and prison conditions.

Smith's childhood and adolescence were chaotic and disruptive. The District Court noted, *inter alia,* that Smith, who was born October 7, 1958, suffered serious head injuries and was treated for lead poisoning as a child, that Smith's father was an alcoholic given to beating his wife and children, and

that Smith began using drugs and alcohol by age 13. Further, Smith had begun petty thievery by age ten, and was placed in a Missouri juvenile-detention center at age 15. After his release from this center, Smith had no steady job, and instead continued to steal to support himself. Smith had a girlfriend whom he abused physically; she gave birth to their daughter in July 1979.

On September 8, 1980, Smith killed Karen Roberts, bludgeoning her with a heavy iron bar. Smith stated that he did this because Roberts gave him a venereal disease, which caused his girlfriend to take their child and leave him. A few months later, after Smith's arrest for the murder, Smith's lawyer and the prosecutor were on the verge of entering a plea-bargain agreement for a second-degree murder plea when the *St. Louis Globe-Democrat* published a letter from Smith. Smith signed the letter "Gerald Smith, the cold-blooded killer," and claimed in it that he had planned the murder for four months, and that, though he had a gun with him, he bludgeoned Roberts so that she would feel more pain. As a result, the prosecutor ended plea negotiations, and Smith was tried and convicted for capital murder. Smith testified in the competency hearing that he had not, in fact, planned the murder or carried a gun at the time. Though Smith has told psychiatrists that he wrote the *Globe-Democrat* letter because he wished to die, he testified in the District Court that he did not know why he had written the letter.

Before the murder, Smith had attempted suicide three times. On the last such occasion, Smith was admitted to Alexian Brothers Hospital in St. Louis; he was diagnosed as suffering from depression and a personality disorder, but was released from the hospital. In 1981 and 1982, after his imprisonment, Smith on several occasions engaged in self-mutilation, such as the infliction of multiple lacerations on his wrist and forearm. In May 1983, Smith attempted suicide a fourth time, overdosing on Elavil, an antidepressant.

As discussed above, Smith has frequently shifted his position on the desirability of post-conviction proceedings. When he has opposed ongoing proceedings, he has written a number of letters to the courts involved, calling them vulgar names, and urging and daring them to permit his execution. Smith has also threatened to kill his attorneys and prison guards if his wish to be executed is not respected. On the other hand, when he has favored pursuing relief, Smith has apologized profusely for his statements and behavior.

Smith's latest change of position before the District Court hearing, a change to opposition to relief, came in June 1985, while the first federal habeas petition was pending. Smith was then incarcerated on death row. The District Court received "considerable evidence that life on death row was dismal," including testimony concerning lack of exercise, the back-up of raw sewage into cells, infestation of pests, and a lack of ventilation. 632 F.Supp. at 512 n. 24, 515. In November 1985, Smith was transferred to MSP's maximum-security area, the Special Management Unit (SMU). The Court heard testimony that SMU was more depressing than death row because SMU inmates were more isolated, but also heard testimony that SMU was a more humane environment than death row because it had bigger cells and better lighting, security, and supervision.

### C.

The psychiatrists and psychologist who examined Smith were, the District Court noted, 632 F.Supp. at 511, largely agreed as to the nature and severity of his psychological problems. All concurred that Smith suffered from neither a "mental disease" nor a "mental defect," see *Rees*, 384 U.S. at 314, 86 S.Ct. at 1506, and the District Court so found. 632 F.Supp. at 514.[5] Yet, all or

---

5. We are told that a "mental disease" is a mental condition, such as schizophrenia, that causes one to lose contact with reality and be unable to cope with day-to-day life. Whether a condition

constitutes a mental disease is largely a matter of how severely it disorients one from reality. 632 F.Supp. at 511 n. 19. A "mental defect," on the other hand, is a condition, such as mental

most of the experts also agreed, and the District Court found, *id.*, that Smith does suffer from three conditions that are "mental disorders," as that term is used in *Rees.* These are: a "borderline personality disorder"; an "antisocial personality disorder"; and chronic mild-to-moderate depression.[6] These disorders are linked to three salient aspects of Smith's personality: impulsive and erratic behavior, low self-esteem, and presentation of "a macho image, one that is invulnerable to fear, compassion or remorse," 632 F.Supp. at 510 (footnote omitted), in an effort to mask perceived weaknesses. Smith's borderline personality disorder, described by the District Court in Freudian terms as an inability to control the "Id," is marked by his impulsive, erratic behavior, lack of self-control, dependence on others for guidance, and guilt over these shortcomings. *Id.* at 511. Smith's antisocial-personality disorder produces in him a feeling that he is not bound by society's rules, and a compulsion to break them. *Id.* Finally, Smith's depression is linked to his low self-esteem and reflected in his suicide attempts and self-multilation. *Id.*

Although the expert witnesses generally shared this analysis of Smith's mental disorders, they divided into two camps in appraising the relationship between his disorders and his decision to abandon post-conviction proceedings. Drs. Daniel and Harry, who examined Smith in 1983 after his last suicide attempt, concluded in their written reports that Smith's opposition to pursuing his remedies was a direct result of his mental disorders, rather than a product of rational decisionmaking. This conclusion was shared by Drs. Perlswig and Ratner, who examined Smith near the time of the hearing and testified for Eugene Smith.

On the other side, the State's experts, Dr. Ajans, who examined Smith in October 1984 and February 1986, and Dr. Parwatikar, who examined Smith four times, most recently in 1985, concluded that despite

Smith's mental disorders, his decision was the product of a rational thought process and appreciation of his circumstances. Drs. Foster and Pettipiece, independent experts who examined Smith during his stay at the Federal Medical Center, also concluded that Smith's decision was rational. These psychiatrists emphasized that Smith, who scored above average on intelligence tests administered at the Federal Medical Center, possessed a good cognitive awareness of his situation and legal prospects, and that he values freedom highly and finds his physical confinement intolerable. Dr. Foster observed that Smith's certainty of and commitment to his decision was evidenced by his willingness to undergo the spectacle and humiliation of a competency hearing; this contrasts sharply with Smith's usual efforts to mask his weaknesses through presentation of a macho persona. Hence, these four psychiatrists concluded that when Smith explained his decision by stating that he preferred death to life imprisonment, he accurately reported his thought processes.

The District Court, in evaluating the evidence before it, found Dr. Foster's testimony particularly helpful; the Court noted that Dr. Foster was not associated with either party, had spent far more time on Smith's case than any of the other experts, had wrestled long with the competency question, and had candidly acknowledged the uncertainties inherent in resolving this question. 632 F.Supp. at 513 n. 28, 514. The Court concluded that unlike many of Smith's past irrational and self-destructive decisions, his decision to forego further legal proceedings was based on a reasonable assessment of his position and an evaluation of his own best interests that the Court, whatever its own view of his choice, could not say was irrational. 632 F.Supp. at 514–15. The District Court also found that Smith's decision was voluntary. The Court assumed, without deciding, that death-row conditions violated the Eighth

retardation, that is directly linked to physical brain abnormalities. *Id.* at 511 n. 20.

6. The various experts disagreed about the degree and permanence of Smith's depression, but several of them supported the District Court's finding of chronic mild-to-moderate depression.

Amendment. *Id.* at 512 n. 24. However, it found that this did not render Smith's decision involuntary because Smith had adhered to his decision after his transfer to SMU, where conditions were much better than on death row, and because it was the fact, and not the conditions, of his confinement that Smith found most oppressive. *Id.* at 515. Thus, finding Gerald Smith's decision competent and voluntary, the District Court dismissed Eugene Smith's next-friend petition.

## II.

■ Before addressing the merits of this appeal, we must first consider whether a development since the District Court issued its decision has rendered this case moot. In a letter to this Court dated August 25, 1986, Gerald Smith states that he now desires to prosecute his habeas petition. Smith indicates that he has just been transferred back to death row, where conditions have improved, and attributes his earlier opposition to habeas proceedings to the conditions of his confinement in SMU, despite his District Court testimony to the contrary.

We note first that notwithstanding Smith's new stance, the controversy over his competency remains live, in that, were it accepted that he is incompetent, the petitioners would be prejudiced if they were deprived of the opportunity to vindicate their position in this Court. Incompetence could cause Smith to prosecute his case in a manner that would actually subvert his claims. Indeed, it is conceivable that Smith's recent statements were a ploy through which Smith, seeking to effectuate an incompetent decision to forego post-conviction proceedings, hoped to ensure that this case was dismissed; see *Rumbaugh v. Procunier,* 753 F.2d 395, 398 (5th Cir.), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985), in which a death-row inmate employed a similar strategem.

In any case, it is also our view that Smith's past inconstancy on this question

indicates that it is likely that Smith will change his mind yet again and resume his opposition to post-conviction proceedings. Consequently, we conclude that Smith's frequent about-faces bring this case within the "capable of repetition, yet evading review" exception to the mootness doctrine. See *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 602–03, 102 S.Ct. 2613, 2617–18, 73 L.Ed.2d 248 (1982); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Accordingly, we take up the issues raised by the petitioners.

## III.

The petitioners contend that the District Court misinterpreted and misapplied *Rees v. Peyton's* competency standard. They also attack the District Court's factual findings that Smith was competent and that his decision was voluntary. Finally, the petitioners maintain that the District Court "improperly sanctioned Smith's state-aided suicide by allowing him to waive his post-conviction appeals in violation of the Eighth and Fourteenth Amendments." Appellants' Brief at 42.

## A.

■ *Rees v. Peyton* concerned a death-row inmate who sought to withdraw his petition for certiorari to review the denial of his federal habeas corpus petition. The Supreme Court stated the standard for determining the inmate's competence to do so as:

> whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.

384 U.S. at 314.[7]

The petitioners assert that the District Court misinterpreted this standard when it

---

**7.** The Supreme Court retained jurisdiction of *Rees* while directing the District Court to evaluate Rees's competence, 384 U.S. at 313–14, 86

S.Ct. at 1506, and later ordered the petition for certiorari held without action until it issued further orders, 386 U.S. 989, 87 S.Ct. 1310, 18

proceeded to determine whether Smith's waiver decision was *in fact* a product of his mental disorders. *Rees*, they maintain, indicates through its use of the word "may" that an inmate must be found incompetent where the evidence establishes even a mere *possibility* that a mental disorder substantially affected the decision. See *Rumbaugh v. Procunier*, 753 F.2d at 409–10 n. 8, 412 (Goldberg, J., dissenting). The petitioners cite a number of Supreme Court opinions supporting the proposition that, because of the final and irrevocable nature of the death penalty, "the Eighth Amendment requires a heightened degree of reliability in any case where a State seeks to take the defendant's life." *Darden v. Wainwright*, —— U.S. ——, 106 S.Ct. 2464, 2476, 91 L.Ed.2d 144 (1986) (Blackmun, J., with Brennan, Marshall, and Stevens, JJ., dissenting) (citation omitted); see *id.* at n. 1 (collecting cases); *Turner v. Murray*, —— U.S. ——, 106 S.Ct. 1683, 1688, 90 L.Ed.2d 27 (1986) (plurality opinion of White, J., joined by Blackmun, Stevens, and O'Connor, JJ.). Corollary to this in the present context, the petitioners contend, is a requirement that a prisoner under a death sentence not be permitted to waive his or her post-conviction remedies if there is any possibility that the decision is a product of a mental disease, disorder, or defect. *Cf. Ford v. Wainright*, —— U.S. ——, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Eighth Amendment prohibits executing insane prisoners).

We do not agree with this interpretation of the *Rees* per curiam. While there is no Supreme Court decision applying *Rees*, see note 7 *supra*, and, indeed, a dearth of other caselaw addressing the issue, we note that the only other circuit court opinion applying *Rees* supports the District Court's interpretation. See *Rumbaugh v. Procunier, supra*, 753 F.2d at 398–99; see also *Hays v. Murphy*, 663 F.2d 1004 (10th Cir. 1981). More importantly, the petitioner's literal interpretation of the half of the *Rees* test which asks whether the prisoner suffers from "a mental disease, disorder, or defect which may substantially affect his capacity," would conflict with a similarly

literal interpretation of the other half of the test, which asks whether the prisoner has, rather than absolutely, certainly, or undoubtedly has, the capacity to appreciate his position and make a rational choice. Though *Rees* recites these two portions of the standard as disjunctive alternatives, there is necessarily an area of overlap between the category of cases in which at the threshhold we see a possibility that a decision is substantially affected by a mental disorder, disease, or defect, and that of cases in which, after proceeding further, we conclude that the decision is in fact the product of a rational thought process.

Furthermore, we think it very probable, given the circumstances that perforce accompany a sentence of death, that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect. Yet, *Rees* clearly contemplates that competent waivers are possible, see also *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976), and there is little point in conducting a competency inquiry if a finding of incompetency is virtually a foregone conclusion.

■ The petitioners also assert that the District Court erred by construing *Rees*'s requirement that Smith have the capacity to appreciate his position and to make a rational choice to require only that he be cognizant of his factual circumstances, and that his choice be logical, the product of a process of reason. The problem with this, they explain, is that in evaluating competency, it is necessary not only to test the individual's ability to reason, but also to determine whether he or she is reasoning from premises or values that are within the pale of those which our society accepts as rational. Logic employed in the service of irrational premises does not produce a rational decision. We agree with the petitioners that it is not sufficient simply to determine whether a waiver decision has been arrived at logically, but we conclude that

---

L.Ed.2d 333 (1967). No further orders have been reported, and the case is still pending as item S–2 on the Supreme Court's Special Docket.

the District Court did not limit its inquiry in this manner. The District Court's opinion does not articulate such a constricted view of the question, see, *e.g.,* 632 F.Supp. at 508–09, 514–15, and, moreover, the Court examined the rationality of the values and beliefs underlying Smith's decision, including his aversion from confinement, and his conclusion that, in any case, he will be unable to avoid a life sentence, see, *e.g., id.* at 513 & n. 26, 514 & n. 29; 515 & n. 31.

■ The petitioners launch a number of assaults upon the factual findings underlying the District Court's competency determination, arguing, *inter alia,* that the District Court erred in relying upon the psychiatrists who found Smith competent rather than those who found him incompetent, and in failing to find that Smith irrationally failed to consider all his values and alternatives. We review these factual findings under the clearly erroneous standard. *Rumbaugh,* 753 F.2d at 322; *Walker v. Lockhart,* 726 F.2d 1238, 1249 (8th Cir. 1984) (en banc), *vacated on other grounds,* 763 F.2d 942 (8th Cir.1985) (en banc), *cert. denied,* —— U.S. ——, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986); *Hoefelman v. Conservation Comm'n of Missouri,* 718 F.2d 281, 285 (8th Cir.1983) (assessment and evaluation of the strengths and weaknesses of conflicting expert testimony are particularly within the factfinder's province and are to be reviewed under the clearly erroneous standard). Our review of the transcript and the other evidence before the District Court persuades us that there is ample support in the record for its findings. The District Court applied itself thoughtfully and conscientiously to the resolution of a difficult, morally troubling question. We are further bolstered in this conclusion by the fact that the District Court, unlike any other court that has considered the question, placed the burden of proof upon the State, rather than the would-be next friend.

See *Rumbaugh,* 753 F.2d at 414–15 & n. 15 (Goldberg, J., dissenting); compare *Groseclose ex rel. Harries v. Dutton,* 594 F.Supp. 949, 951–52 (M.D.Tenn.1984); *Rumbaugh v. Estelle,* 558 F.Supp. 651, 652 (N.D.Tex. 1983), *aff'd,* 753 F.2d 395 (5th Cir.), *cert. denied,* 473 U.S. 919, 105 S.Ct. 3544, 87 L.Ed.2d 668 (1985).[8]

As the District Court frankly acknowledged, "[n]ecessarily, this issue cannot be resolved with absolute certainty: no one can be sure of what goes on in the human mind." 632 F.Supp. at 514. While we have to be mindful of this uncertainty, we also have to resolve the question before us, and we must do so by reference to the only sort of evidence we can ever have about the mental state of another human being—evidence of that person's behavior in the world. Here, it is true, that evidence could have convinced a trier of fact that Smith was not competent; but it is also true that the District Court was cognizant of the limits on human knowledge in this milieu, and reached a conclusion that does not rest on a cramped view of the evidence, much less one that is clearly erroneous.

We therefore affirm the District Court's conclusion that Gerald Smith's decision to forego further struggle against the imposition of his death sentence was competent.

### B.

■ We are also unable to agree with the petitioners' assertion that the District Court erred in finding that Smith's decision was voluntary.[9] The record, particularly the testimony of Dr. Foster, Tr. 2:124–26, supports the District Court's conclusion that conditions on SMU were not coercive. We think that the District Court was justified in concluding that, even if death row's conditions were in violation of the Eighth Amendment, the fact that Smith continued to adhere to his decision over the months between his transfer to SMU and the Dis-

---

8. Since the District Court found that the State had met this burden, and since we affirm its findings, we need not reach the propriety of this allocation of the burden of proof.

9. We reject the State's argument that the petitioners could not raise this claim; as the District

Court made clear, 632 F.Supp. at 515 n. 32, were it true that a next-friend cannot raise the voluntariness issue, no one could raise it, since, by hypothesis, the inmate may be unable to do so as a result of coercion. See *Groseclose,* 594 F.Supp. at 956–62.

trict Court hearing negated any inference of coercion.

The petitioners make much of Smith's recent letter to this Court, in which he asserts that, notwithstanding his District Court testimony, the conditions of his confinement did affect his decision. However, this letter obviously was not before the District Court, nor is it properly part of the record here; the statements in it were not made under oath, nor have they been subjected to cross-examination. Moreover, we are not convinced that Smith's letter alters matters; the evidence concerning the actual conditions that obtain in the SMU remains unchanged, and the District Court found them not coercive. We therefore affirm the District Court's conclusion that Smith's decision was voluntary.

## C.

■ The petitioners' final argument is that the Eighth and Fourteenth Amendments prohibit permitting a capital defendant to waive his right to post-conviction review of his death sentence. They maintain that to allow such a waiver constitutes "state-aided suicide," which is fundamentally unfair and inconsistent with our society's "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion), and that it is irreconcilable with the respect for life embodied in the Eighth Amendment. The petitioners conclude that they have standing on this basis to proceed as Smith's next friends.

We believe that this argument is foreclosed by *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632 (1976) (per curiam), in which the Supreme Court terminated a stay of execution upon ascertaining that Gilmore's decision to waive review of his death sentence was made competently, knowingly, and intelligently, and that his mother therefore lacked standing to contest the sentence. Justice White, joined by

Justices Brennan and Marshall, dissented, arguing that "the consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment." 429 U.S. at 1018, 97 S.Ct. at 439.[10] However, that five justices concluded that Gilmore's mother lacked standing makes clear at the very least that, even if there is some such bar to waiving review, it does not serve to confer standing upon a next friend in the absence of some other basis for standing. See *id.* at 1016–17, 97 S.Ct. at 439 (Burger, C.J., joined by Powell, J., concurring) (expressly declining to decide whether review is waivable, since, in any case, there is no next-friend standing); *id.* at 1017, 97 S.Ct. at 439 (Stevens, J., joined by Rehnquist, J., concurring) (no next-friend standing). We also think that this proposition is implicit in *Rees* itself; an inquiry into competency in death-penalty cases would be superfluous if next-friend standing could be predicated upon an Eighth Amendment bar to waiving review.

## IV.

We affirm the District Court's conclusion that Smith was competent to forego pursuit of federal habeas corpus review, and that his decision to do so was voluntary. Accordingly, we also affirm the District Court's dismissal of the petitioners' next-friend petition for lack of standing.

■

10. Justice Marshall also filed a separate dissent, arguing the inadequacy of the procedures through which Gilmore was determined to be competent. 429 U.S. at 1019, 97 S.Ct. at 440. Justice Blackmun also dissented, but did not join Justice White's opinion, arguing instead simply that there were substantial questions regarding Gilmore's mother's standing, meriting plenary Supreme Court review. 429 U.S. at 1020, 97 S.Ct. at 440.