Rev. Louis J. FRANZ, Individually and as Next Friend of
Ronald Gene Simmons *v.* STATE of Arkansas

CR 88-76                                          754 S.W.2d 839

Supreme Court of Arkansas
Opinion delivered July 11, 1988

*Mark S. Cambiano*, for appellant.

*Steve Clark*, Att'y Gen., by: *Jack Gillean*, Asst. Att'y Gen., for appellee.

*John Harris* and *Robert E. Irwin*, for Ronald Gene Simmons.

Robert H. Dudley, Justice. On May 16, 1988, Ronald Gene Simmons was convicted of capital murder and sentenced to death in the Circuit Court of Franklin County. Immediately after being sentenced, Simmons took the stand and made a statement that included the following: "I, Ronald Gene Simmons, Sr., want it to be known that it is my wish and my desire that absolutely no action by anybody be taken to appeal or in any way change this sentence. It is further respectfully requested that this sentence be carried out expeditiously." Even after the trial court set a date for execution, Simmons refused to exercise his unqualified right of appeal. The trial court subsequently conducted a hearing and found that Simmons was competent to waive his right to an appeal and that his decision on the waiver was knowingly and intelligently made. As the date for execution neared, Rev. Louis J. Franz petitioned this court to allow him to proceed in this Court on Simmons' behalf as next friend, asked for a stay of execution, and asked that we make appeal mandatory in death cases. We granted a stay of execution and asked the parties and the petitioner to file briefs on (1) whether the petitioner has standing; (2) whether this Court should change its rules to require mandatory review of death cases; (3) if there is no rule change to require mandatory review of death cases, whether a decision to waive appeal in a death case should be reviewed by this Court; and (4) if appeal may be waived, whether the defendant in this case

understood the choice of life or death and knowingly and intelligently made that choice. Briefs have been received and oral arguments have been heard on the issues.

### 1. Standing of Rev. Franz

The requirements of next friend standing are twofold. *See, e.g., Davis* v. *Austin*, 492 F. Supp. 273 (N.D. Ga. 1980). The *Davis* court noted, "The petitioners must first meet the threshold requirement of showing they are 'next friends.' If that showing is made, petitioners must also demonstrate that a 'next friend' suit is maintainable because the person on whose behalf they act is incompetent." *Id.* at 275.

As to the first requirement, the qualification as a next friend, the *Davis* court noted:

> The case law does not establish an easily applied test as concerning the requirements for standing as "next friend." The cases establish that such actions may be appropriate in cases of infancy, lack of time, and incompetency. *United States* v. *Preiser*, 506 F.2d 1115, 1126 n.8 (2d Cir. 1974). Although the relationship and interest of the proposed "next friend" is to be considered by the court before it entertains such an action, the cases do not adequately define who might act as next friend. *See Weber* v. *Garza*, 570 F.2d 511 (5th Cir. 1978). The court must start with the proposition that members of the public in general do not have a right to intercede as "next friend" in an action such as this because they are morally or philosophically opposed to the death penalty. On the other end of the scale, close relatives, such as a parent, spouse, or sibling, who maintain a close personal relationship with the aggrieved, would be appropriate persons to maintain a "next friend" action.

*Davis*, 492 F. Supp. at 275.

The facts of the *Davis* case are similar to the facts in this case. One of the persons seeking "next friend" status in *Davis* was the Rev. Murphy Davis. The court noted:

> The testimony shows that Reverend Davis is an ordained Presbyterian minister and Director of the Southern Prison Ministry of Georgia. She is philosophically opposed to

> capital punishment. Reverend Davis has had some personal contact with [the defendant] over approximately one and a half years and has counseled with him on occasion. The evidence does not demonstrate that she is in any way his personal minister or religious adviser.

*Id.* The court held, "Although the court has no doubt as to the deep sincerity of Reverend Davis' convictions, her connection with [the defendant] is that of a concerned minister who has made herself available to assist him. Such a relationship is insufficient to confer upon her status as 'next friend.' " *Id.* at 275-76. The court then went on to quote Justice Rehnquist's concern expressed in an opinion written in the capacity of Circuit Justice: "[H]owever worthy and high minded the motives of 'next friends' may be, they inevitably run the risk of making the actual defendant a pawn to be manipulated on a chessboard larger than his own case." *Lenhard* v. *Wolff*, 443 U.S. 1306, 1312, *stay of execution denied*, 444 U.S. 807 (1979), *quoted in Davis*, 492 F. Supp. at 276.

■ Rev. Franz's connection to Simmons is even more tenuous than the one in *Davis*. According to his petition, Rev. Franz is a Catholic priest who counsels inmates at the Arkansas Department of Correction. There is nothing in his petition to indicate that he is Simmons's minister, spiritual adviser, or confidant, or even less, that the two have ever met. We hold that Rev. Franz has failed to allege any facts to show that his relationship to Simmons is sufficiently close to give rise to next friend status, and we therefore cannot grant him standing on this basis.

■ Rev. Franz alternatively argues that even if he does not have standing as next friend, he has standing as a taxpayer under article 16, section 13 of the Constitution of Arkansas, the illegal exaction provision. The argument is without merit for at least two reasons. First, a suit to prevent an illegal exaction must be commenced in a trial court. Such a suit cannot be commenced in this appellate court. Second, the constitutional provision is not so broad that it gives one taxpayer the right to intervene in the merits of a criminal case against another person.

■ Rev. Franz's last alternative argument is that if he is not granted standing in this case then important legal issues will

go unresolved at the appellate level. Even though this is true, it is not sufficient to give petitioner standing. In *Gilmore* v. *Utah*, 429 U.S. 1012 (1976), the Supreme Court of the United States terminated Gary Gilmore's stay of execution at his request. At the time, the constitutionality of the Utah death penalty statute had not been reviewed by either the Utah Supreme Court or the Supreme Court of the United States. Justice White noted in his dissent (which was joined by Justices Brennan and Marshall) that "there are substantial questions under *Furman* v. *Georgia*, 408 U.S. 238 (1972), about the constitutionality of the Utah death penalty statute. Because of Gary Gilmore's purported waiver of his right to challenge the statute, none of these questions was resolved in the Utah courts." *Gilmore*, 429 U.S. at 1017-18 (White, J., dissenting). Justice Blackmun also noted that the constitutional question was "not insubstantial." *Id.* at 1020 (Blackmun, J., dissenting). Chief Justice Burger (joined by Justice Powell) was unconcerned, noting, "Gilmore has not challenged the validity of the statute under which he was convicted, and there is no other party before this Court with requisite standing to do so." *Id.* at 1017 n.7 (Burger, C.J., concurring). The existence of the question was not sufficient to give a third person standing, and, therefore, the question went unresolved at the appellate level. Accordingly, we reject Rev. Franz's attempt to gain standing simply because of the existence of important legal issues which remain unresolved at the appellate level.

## 2. Mandatory Review

However, as has often been noted, "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Gregg* v. *Georgia*, 428 U.S. 153, 188 (1976). Because of the punishment's uniqueness and irreversibility, we choose to state clearly the law in Arkansas regarding the waiver of appeal in death cases.

The threshold question is whether an appeal is mandatory in cases involving a death sentence. We have said that it is not: "[T]here is no mandatory appellate review in Arkansas." *Collins* v. *State*, 261 Ark. 195, 211, 548 S.W.2d 106, 115, *cert. denied*, 434 U.S. 878 (1977).

The next question is whether the lack of mandatory

appeal renders our law unconstitutional. We have held that it does not:

> It is urged, however, that our system does not meet *Gregg-Proffit-Jurek* standards necessary to avoid Eighth and Fourteenth Amendment prohibitions for lack of a mandatory appeal of a judgment imposing the death penalty and of appellate review which compares cases in which the death penalty has been imposed. [This is a reference to the standards set out in *Gregg* v. *Georgia*, 428 U.S. 153 (1976), *Proffitt* v. *Florida*, 428 U.S. 242 (1976), and *Jurek* v. *Texas*, 428 U.S. 262 (1976).]

> We find nothing in any opinion, and certainly no majority, which supports a holding that there *must* be either a mandatory or automatic appeal of a judgment imposing the death penalty or that there *must* be appellate review which compares cases in which the death penalty has been imposed. . . .

> . . . It seems to us that the only actual requirement, even of the Stewart plurality, is that a *meaningful* appellate review is available to insure that death penalties are not arbitrarily, capriciously or freakishly imposed. The important question is whether the system creates a substantial risk of arbitrariness or caprice.

>     . . . .

> The idea that in *Gregg, Proffit*, and *Jurek*, the United States Supreme Court has held that there must be a mandatory or automatic appeal from the imposition of the death penalty by a state trial court seems to have crumbled with the recent actions of the court in *Gilmore* v. *State of Utah*, 429 U.S. 1012, 97 S. Ct. 436, 50 L. Ed. 2d 632 (1976) . . . . If the Constitution of the United States requires that a state provide a mandatory appeal in such cases, we do not see how there can be a knowing and intelligent waiver of "any and all federal rights" [as was found in *Gilmore*] when there has been no appeal from the state trial court's judgment imposing the death sentence. [Gilmore, too, had waived his right of appeal under state law.]

*Collins*, 261 Ark. at 204-06, 548 S.W.2d at 111-12.

■ To support his contention that appeals in death penalty cases are mandatory, the petitioner cites Ark. Code Ann. § 16-91-113(a) (1987) and Ark. R. Crim. P. 36.24. The statute provides, "The Supreme Court need only review those matters briefed and argued by the appellant, except that, where either a sentence for life imprisonment or death has been imposed, the Supreme Court shall review all errors prejudicial to the rights of the appellant." Rule 36.24 contains almost identical language. These provisions, along with Ark. R. Sup. Ct. 11(f), simply mean that this Court must make its own examination of the record when an appeal is taken in such cases; they do not mandate an appeal.

### 3. Waiver

We note, however, that when a defendant sentenced to death declines to exercise his unqualified right to appeal, we will not automatically acquiesce to his desire.

In *Collins*, we noted that "[t]he likelihood that a death penalty would be executed without such an appeal, in the absence of a knowing and intelligent waiver, is highly improbable." *Id.* at 211, 548 S.W.2d at 115. This language recently served as the basis for our decision in *Rameta v. State*, 294 Ark. 206, 740 S.W.2d 928 (1987) (per curiam). In *Rameta*, the defendant had been sentenced to death and wished to be executed. He petitioned us to dismiss his appeal. Relying on *Collins*, we held that such a defendant will not be allowed to forego an appeal unless the trial court, in its discretion, has determined that the defendant's decision has been knowingly and intelligently made. However, we left two questions unanswered in *Rameta*.

■ The first question involves what standard is to be used by a trial court in determining whether a decision to waive appeal is knowing and intelligent. The federal standard seems to be "roughly equivalent to the standard used to determine competency to stand trial: the defendant will be competent unless he lacks sufficient 'capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation.' " White, *Defendants Who Elect Execution*, 48 U. Pitt. L. Rev. 853, 863 (1987) (quoting *Rees v. Peyton*, 384 U.S. 312, 314 (1966) (per curiam)). This standard has been widely

criticized. *See, e.g.*, Strafer, *Volunteering for Execution: Competency, Voluntariness and the Propriety of Third Party Intervention*, 74 J. Crim. L. & Criminology 860 (1983); White, *supra*. We feel that Professor Welsh White correctly summarized the problem with the standard:

> The issue of competency is troubling. The present standard for competency to elect execution is roughly equivalent to the test for competency to stand trial. But the decisions involved in the two situations are entirely different. When competency to stand trial is at issue, the court is required to determine whether the defendant understands the charges against him and has the capacity to communicate effectively with his attorney. When competency to elect execution is involved, the issue is whether the defendant has the capacity to choose between life and death. The focus should be upon not only the defendant's ability to understand the basic issue but also upon his ability to resolve it knowingly and voluntarily. Defense attorneys who specialize in capital cases claim that many capital defendants who have an adequate understanding of the charges against them and are fully competent to communicate with counsel should nevertheless be barred from electing execution because they lack either the judgment or the emotional stability to make a firm and stable decision, much less an informed one.

White, *supra*, at 867 (footnotes omitted). We adopt this higher criterion for declining to exercise the right to appeal in a capital case. Therefore, in Arkansas, a defendant sentenced to death will be able to forego a state appeal only if he has been judicially determined to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence.

The second question unanswered by *Rameta* is whether this Court must review a lower court's determination on the issue of the waiver of an appeal in a capital case. We hold that we must. In future cases, when a lower court has made a determination that a capital defendant can make a knowing and intelligent waiver of appeal, and has done so, the State has the burden of bringing the record of the lower court proceeding on

this issue to this Court for review. The record on this issue should, if possible, be lodged in this Court after the time for appeal has lapsed, but, in any event, it must be lodged at least seven days before the execution date. We will then review the proceeding to determine whether the defendant had the capacity to understand the choice between life and death and to knowingly and intelligently waive his rights to appeal his sentence of death. The standard of review, as in other types of criminal cases, is whether the trial judge's conclusion is clearly erroneous. *See Rector* v. *State*, 277 Ark. 17, 638 S.W.2d 672 (1982).

In this case the trial judge found that the defendant made a rational choice and knowingly and intelligently waived his right to an appeal. That finding is not clearly erroneous.

Not only has the defendant failed to exercise his unqualified right to appeal, but, in addition, after being sentenced, affirmatively stated:

> [I]t is my wish and my desire that absolutely no action by anybody be taken to appeal or in any way change this sentence.

> It is further respectfully requested that this sentence be carried out expeditiously. I want no action that will delay, deny, defer or denounce this very correct and proper death sentence.

> My attorneys have repeatedly counseled me to appeal. However, that is not what I want. I believe now, and always have, in the death penalty. To those who oppose the death penalty, I say in my particular case anything short of death would be cruel and unusual punishment.

> I am of sound mind and body and have been seen by psychoanalysts, who can verify that I am capable of making a clear and rational decision. I have given clear and careful thought and consideration so there is nothing that will cause me to change my mind. I only ask for what I deserve. Let the torture and suffering end. Please allow me the right to be at peace.

At the same time his attorneys gave an affidavit in which they said he is "sane, rational, responsible and able to make his

own decisions."

At a subsequent hearing on his competency to waive appeal, Dr. Lew Neal, a highly qualified psychiatrist hired by the defense attorneys, testified and gave an affidavit which together unequivocally state that Simmons understands the consequences of his choice, is capable of making a rational decision, and is doing so freely and voluntarily.

Dr. Irving Kuo, a psychiatrist with the State Hospital, which is an agency independent of the prosecutor, see *Parker* v. *State*, 292 Ark. 421, 433, 731 S.W.2d 756, 762 (1987), examined Simmons during a sixty day evaluation before the trial and examined him for an hour and a half after the trial. He testified that Simmons understands the consequences of his choice and has made his choice knowingly. The key questions by the trial court and the decisive answers by Dr. Kuo are as follows:

> Q. Of course, the conclusion that the Court has to reach today is not necessarily whether the Defendant appreciated the criminality of his conduct or that he was able to assist his attorneys. What I am required to do now is make a decision as to whether he can knowingly and intelligently waive his right to appeal his conviction. Do you have an opinion along those lines?
>
> A. Yes, I do.
>
> Q. Have you discussed this with Mr. Simmons?
>
> A. Yes, I have.
>
> Q. Do you feel that he is capable of making a decision that is knowingly and intelligently arrived at?
>
> A. Yes, I do.
>
> Q. What is the basis of your opinion?
>
> A. Okay. During the hour and a half that I spoke with him I tried to retrace a little bit of history since the last time I saw him; and basically I conducted an interview for about ninety minutes and touched on a number of topics, including one about the sentencing and his desire to waive the—
>
> Q. The appeal process?

A. —waive the appeal process; and in the course of that, I tried to get a feel of how he was today. I did what we call a mental status examination, which basically is a snapshot of—which basically is a snapshot of his psychiatric or mental condition right at the time that I interviewed him. My assessment was that he looked very much like he did during the two months that I had seen him earlier this year. There was no evidence of any psychotic process. His thinking was goal-directed, was relevant, logical. He seemed able to make an intelligent decision that was not interfered by—that didn't have any interference by any kind of psychiatric problem that I could detect.

Q. Do you feel that Mr. Simmons is under any pressure or anything that's causing him to take this position?

A. Well, I think that Mr. Simmons has some internal pressure in terms of wanting to waive the particular appeal process. I don't think there is any external pressure from any outside source. I think that in spite of the conviction he comes across as an extremely moralistic very rigid gentleman who has some real rigid ideas about right and wrong and his own statement was that the punishment needs to fit the crime and he felt that this was, you know, an appropriate and proper decision, the one that came down on Thursday; and he seemed to think that it was quite proper. He seemed to indicate that he knew what he did. He indicated that it was in a somewhat premeditated fashion and that he felt that the punishment should fit the crime. He told me that he does believe in capital punishment.

At the conclusion of this hearing the trial court found that Simmons was competent to waive his right to an appeal.

One month later a competency hearing was held at the request of the petitioner, Rev. Franz. At that hearing the state hospital psychiatrist, Dr. Kuo, modified his opinion.

Dr. Kuo stated that his modified opinion came about as follows: He wrote to the defendant and said he would like to have another interview in order to obtain information for publication in a professional journal. The defendant responded and in the first

sentence of the fifth paragraph wrote: "Evidence is beginning to surface to indicate that officials are starting to play their little games." Dr. Kuo testified that one sentence "can hint towards" psychosis and therefore he had "some doubt" as to whether that opinion [his original opinion] was correct. At another time he said he had a "doubt," not just "some doubt," about his original opinion.

Dr. Kuo testified that his original opinion was given after sixty days of personal observation, not only by himself but by an evaluation team. He admitted that he had not talked to the defendant since his first opinion and admitted that no other member of the evaluation team was present to testify as to any doubt. Significantly, the petitioner did not attempt to call the defendant's own psychiatrist.

Simmons took the stand and testified that he did not want Rev. Franz or anyone else to serve as his next friend.

The trial court again found Simmons competent to waive his right to appeal. The ruling is not clearly erroneous.

The trial court was in a position to observe the testimony of Dr. Kuo and the defendant. The Supreme Court of the United States has stated:

> In *United States* v. *Oregon Medical Society*, 343 U.S. 169 (1952), commenting on the deference which this Court gave to the findings of a District Court on direct appeal from a judgment in a bench trial, we stated:
>
> > "As was aptly stated by the New York Court of Appeals, although in a case of a rather different substantive nature: 'Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth. . . . How can we say the judge is wrong? We never saw the witnesses. . . . To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.' *Boyd* v. *Boyd*, 252 N.Y. 422, 429, 169 N.E. 632, 634." *Id.*, at 339.

*Marshall* v. *Lonberger*, 434 U.S. 422, 434 (1983).

Dr. Kuo did not retract his statement that the defendant was competent; he only stated that he had doubts about his original opinion. His original opinion was given based upon sixty days observation coupled with an hour and a half interview at the time of the first opinion. The doubt about that opinion was not created by a first-hand interview but by one sentence in a full-page letter. No other member of the evaluation team testified. Neither Dr. Neal, the defendant's psychiatrist, nor the defense attorneys have retracted in any manner their statements that Simmons is competent to waive his right to appeal. Accordingly, we affirm the trial court's ruling that the defendant is competent to waive his unqualified right to appeal.

We hold that Rev. Franz does not have standing and that the defendant understands the choice of life and death and has made a knowing and intelligent waiver of his right to appeal. Accordingly, the stay of execution which we granted on June 20, 1988, is hereby terminated. Since Rev. Franz does not have standing, he does not have standing to file a petition for rehearing. Therefore, the mandate is ordered to be issued at the time this opinion is handed down.

HAYS, J., dissents.

GLAZE, J., concurs in part and dissents in part.

TOM GLAZE, Justice, concurring in part and dissenting in part. I agree with the majority that Reverend Louis J. Franz has no standing to pursue an appeal on behalf of Ronald Gene Simmons. While this court is confronted for the first time with the standing and competency issues in a death penalty situation, those issues have been considered and decided in numerous cases in other jurisdictions. *See Smith, Mo. Public Defender Comm'n* v. *Armontrout*, 812 F.2d 1050 (8th Cir. 1987); *Lovelace* v. *Lynaugh*, 809 F.2d 1136 (5th Cir. 1987); *Rumbaugh* v. *McKaskle*, 730 F.2d 291 (5th Cir. 1984); *Hays* v. *Murphy*, 663 F.2d 1004 (10th Cir. 1981); *Davis* v. *Austin*, 492 F. Supp. 273 (N.D. Ga. 1980); *State* v. *Hightower*, 214 N.J. Super. 43, 518 A.2d 482 (1986); and *State* v. *Bailey*, 519 A.2d 132 (Del. Super. Ct. 1986). All of the foregoing decisions cite *Gilmore* v. *Utah*, 429 U.S. 1012 (1976), and in relying on *Gilmore*, those courts have either

generally, or specifically, adhered to the proposition that a defendant who has been sentenced to death can make a competent, knowing and intelligent choice to abandon further litigation, and when that choice is made, it will be honored by the courts. In each of the cases set out above, the court, quoting from *Rees* v. *Peyton*, 384 U.S. 312 (1966), posed the critical issue as follows: "Whether the defendant has the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." If the defendant is determined to be competent, then a next friend has no standing to pursue further proceedings when the defendant chooses not to proceed.

In the present case, the trial judge held hearings to determine Simmons's competency, and after analyzing considerable evidence and testimony, the judge found Simmons had the capacity to waive his right to an appeal. It is this court's duty to review the lower court's findings under the clearly erroneous standard. *Cf. Smith, Mo. Public Defender Comm'n*, 812 F.2d at 1058. The majority opinion details much of the testimony taken during the hearings bearing on the competency issue, and I thoroughly agree with the finding that the trial judge's decision is not clearly erroneous.

In reaching its decision, the majority concludes that this court must review a lower court's determination on the issue of the waiver of an appeal in a capital case. While the court gives no basis for its holding, I have no doubt that such a decision is required by the Supreme Court's holding in *Gilmore*. It is really unimportant why the majority has decided that an appellate review is necessary in order to examine the waiver issue in capital cases, but once the majority did so, I believe it should have expanded such a review to include the sentencing stage of a defendant's trial. My reasons for suggesting such a review are several.

First, the Supreme Court has not yet decided the issue as to whether a defendant has the power to waive the right to a state appellate review. *Gilmore*, 429 U.S. at 1017 (Burger, C.J., concurring). Instead, the Supreme Court in *Gilmore* merely

reviewed the record bearing on Gilmore's competency and decided his mother did not have standing to speak for him. I believe the Supreme Court's holding implicitly requires that an appellate review be given in such competency matters. However, little more can be gleaned from the *Gilmore* decision. As a consequence, the Supreme Court—as well as this court—must still decide whether appellate reviews are mandated in capital cases. This court in *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977), discussed this very issue and by a four-to-three vote, the majority concluded that a mandatory or automatic appeal of a judgment imposing the death penalty is not required. Justice George Rose Smith wrote a persuasive dissenting opinion asserting that a mandatory review should be provided. Nothing more on the subject has been done by either this court or the General Assembly, and the Supreme Court has not reached or conclusively decided whether such appeals are mandated by the Constitution.

In addition to the fact that a substantial constitutional question still remains unresolved concerning the question of mandatory review, Arkansas, and perhaps Ohio, are the only states that have no specific provisions for an automatic review of capital cases. *See* U.S. Dept. of Justice, Bureau of Justice Statistics, Bull., *Capital Punishment, 1986* (Sept. 1987).[1] Although Ohio has been noted as a state that does not provide for an automatic review, the case of *State* v. *Brooks*, 25 Ohio St. 3d 144, 495 N.E.2d 407 (1986), lends some argument to the contrary. While such issue was not specifically addressed in *Brooks*, it is important to note that Brooks's motion to withdraw his appeal of the death sentence was denied by the Ohio appellate court even though the record reflected Brooks was competent to stand trial.[2] After denying Brooks's motion, the Ohio Court of Appeals, and later the Ohio Supreme Court, reviewed Brooks's death sentence in detail, concluding that the sentence was proper. In sum, out of the thirty-seven states that provide for the death penalty, thirty-

---

[1] This Bulletin recites Arkansas, Florida, Ohio and Vermont have no such provisions but both Florida and Vermont have since amended their laws to provide mandatory reviews.

[2] Apparently the Ohio courts never required a hearing (or found one was necessary) to determine whether Brooks was competent to waive his right of appeal.

five of them require an automatic review. As pointed out, the Ohio courts, representative of one of the two states that have no automatic review requirement, have failed to address the issue directly, but instead opted to review a capital case even after the defendant (who was found competent to stand trial) sought to abandon his right of appeal. Thus, by the majority's opinion Arkansas becomes the only state that actually has chosen not to review a death penalty case.

Another reason for requiring reviews in death penalty situations is reflected in this state's present laws. Arkansas's laws clearly provide that great scrutiny be given death penalty cases before a defendant is executed. For example, in capital felony murder cases, a separate phase of the trial is required for sentencing, at which evidence relating to aggravating or mitigating circumstances may be presented to the same jury that found the defendant guilty of the crime. Ark. Code Ann. § 5-4-602 (1987). The jury is authorized to impose the death sentence only if it unanimously returns written findings that the aggravating circumstances exist beyond a reasonable doubt, that the aggravating circumstances outweigh all mitigating circumstances, and that the aggravating circumstances justify a sentence of death beyond a reasonable doubt. Ark. Code Ann. § 5-4-603 (1987). Also, this court has held that the review of capital cases with death sentences requires the court to consult prior cases as precedent in order to determine whether there was error in the sentencing procedure, whether the evidence was sufficient to support any finding made by the jury, whether any of the findings were the result of passion or prejudice or other arbitrary factors and whether there was an abuse of discretion of either the jury or the trial judge in imposing sentence. *Collins*, 261 Ark. at 221, 548 S.W.2d at 212. Furthermore, this court is mandated under A.R.Cr.P. Rule 36.24 and Ark. Sup. Ct. R. 11(f) to review the entire record for errors prejudicial to the right of the appellant. Obviously, without mandatory appellate review, none of the foregoing legal requirements can be measured when a defendant chooses to waive his right to appeal—which leads me to the final reason why I believe the appellate review of a defendant's sentence should be required.

In my view, no criminal defendant, including Simmons in this cause, should dictate this state's policy concerning whether

death sentences should be reviewed. The question posed in these cases in no way involves the constitutionality of the death penalty itself. The courts are, however, confronted with the various constitutional and statutory requirements needed to be complied with when imposing the death penalty.

In a number of cases cited earlier in this opinion, the criminal defendants often changed their minds during their trials or appeals as to whether they desired to abandon or continue their rights of appeal. Obviously, such changes in attitude can be expected, but those changes also lead to extensions and delays in the judicial process. This court can avoid such delays by taking charge of this state's appellate process and requiring that in every capital case where the death penalty has been imposed, the court will automatically review the lower court's record of the *sentencing phase* of the trial.

The majority has—as I believe *Gilmore* requires—provided for review of any competency hearing required when a defendant chooses to waive his or her right of appeal. In the present case, a little more than two months have transpired between Simmons's competency hearing and this court's final review of that hearing. In my estimation, no delay would have been added if this court had reviewed the sentencing stage of Simmons's trial. By adopting such a review procedure, the court would allow any defendant to waive his right of appeal concerning his guilt, but at the same time, the state's highest court would provide a prompt review concerning whether the death penalty was constitutionally and appropriately imposed. This would ensure the scrutiny of death penalty cases that our law mandates.

Because Arkansas's present procedure is, in my view, constitutionally suspect, this court could avoid those constitutional questions and potential pitfalls by reviewing the sentence phase of death penalty cases. Such a review would, at the same time, provide a more expeditious manner by which such capital cases may be disposed. Certainly, such a review procedure would place the process of review of capital cases in the control of the state's judiciary, as it should be, rather than at the impulse or whim of a defendant.

STEELE HAYS, Justice, dissenting. While I concur in the majority view that the Reverend Louis J. Franz lacks standing to

act as next friend for Ronald Gene Simmons, I would adopt a rule for mandatory appellate review and apply it to this case.

I concede there is no express provision in our law for mandatory appeal, but it is at least arguable that our law now implicitly provides for mandatory review by this court in cases in which a sentence of death is imposed. While dictum to the contrary appears in *Collins* v. *State*, 261 Ark. 195, 211, 548 S.W.2d 106 (1977), that was not the holding and certainly does not prevent our adopting a rule for mandatory review in death cases. Moreover, in *Collins* this court committed itself to a proportional review where death is imposed on the defendant. Our Rule 11(f), adopted pursuant to Act 333 of 1971, states that "when the sentence is death or life imprisonment, the court *must* review all errors prejudicial to the appellant." (My emphasis.) Additionally, in *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980), we said that in a capital case if the trial court fails to instruct the jury that it has the option of returning a lesser penalty than death, that is reversible even in the absence of an objection. Keeping faith with *Wicks, Collins*, and Rule 11(f), mandates, I submit, appellate review of the entire record in death cases.

But whether the law now provides for mandatory appeal is beside the point, as it is plainly within the rule making power of this court to effectuate such a rule to operate immediately. If we can change our rule in a civil case to affect pending litigation, as we did in *Ford Motor Credit Co.* v. *Nesheim*, 287 Ark. 78, 696 S.W.2d 732 (1986),[1] we can certainly do so where the death sentence is involved.

The adoption of such a rule, as I envision it, simply means that, notwithstanding a waiver of appeal by the defendant, this court, on information from either the Attorney General or the trial court, that a death sentence has been imposed, would issue a writ of certiorari for the record and appoint counsel to argue any errors prejudicial to the defendant. The unique severity of the death sentence and the public interest in its imposition demand nothing less.

---

[1] On March 18, 1985, we amended Rule 2(a)(9) of the Rules of Appellate Procedure to permit an appeal by *Ford Motor Credit Co.* from an order of the trial court certifying the case as a class action.

The public's interest and right to having a review of a death sentence is discussed in Kaine, *Capital Punishment and the Waiver of Sentence Review*, 18 Harv. C.R.-C.L. L. Rev. 483 (1983) (footnotes omitted):

> The societal interest in ensuring that capital punishment is fairly imposed is too great to allow execution without the appellate scrutiny required by the eighth amendment . . . .
>
> It is also inappropriate to grant complete power to a defendant's waiver when that choice will infringe upon the constitutional rights of other citizens. The [Supreme] Court recognized this limitation on waiver in *Richmond Newspapers* v. *Virginia*, by holding that the first amendment rights of reporters and others to be present at a criminal trial outweighed a defendant's waiver of a public trial. Similarly, an attempt to force execution by the state prior to the resolution of inquiries required by the Constitution violates that document's protection of the public from abuse of state power.
>
> Finally, statutory and judicial restrictions upon the ability of a capital defendant to decide whether to be present at trial or to pursue review of a sentence—decisions not generally based on specific constitutional protections—reflect the understanding that the death penalty is a matter of public as well as individual concern.

I do not question the right of a competent defendant to refrain from participating in an appeal, or to deny others the right to act in his behalf. But that right does not empower a defendant to by-pass appellate review any more than he could by-pass a trial or, if a plea of guilty is entered, a hearing on the guilty plea. These steps are basic, and where the sentence is death, appellate review is equally basic. By rejecting the opportunity to adopt a rule of mandatory review the majority has put Arkansas at odds with all but one of the thirty-seven states which have the death penalty, not an enviable position, and not one likely to endure.