## AMERICAN CIVIL LIBERTIES UNION of Arkansas *v.* STATE of Arkansas

99-00335                                             5 S.W.3d 418

Supreme Court of Arkansas
Opinion delivered December 2, 1999

*Jeff Rosenzweig*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee State of Arkansas.

*Mark J. Mobley*, for appellee James Stanley.

ANNABELLE CLINTON IMBER, Justice. On November 9, 1998, appellee James Ray Stanley pled guilty in Sebastian County Circuit Court to rape and sexual solicitation of a child. Both of Mr. Stanley's victims were boys under the age of fourteen. Based on a plea agreement that Mr. Stanley reached with the State, the court sentenced Mr. Stanley to thirty years in the Arkansas Department of Correction on the rape charge and six years on the solicitation charge, with the sentences to run concurrently. On the rape charge, the trial court ordered ten years of the thirty-year sentence suspended, conditioned upon Mr. Stanley submitting to physical castration and also completing the sexual offender (RSVP) program at the Department of Correction and attending sexual offender counseling after release from the Department of Correction. These conditions were part of the plea agreement that Mr. Stanley negotiated with the State. With regard to the requirement of castration as a condition of the suspended sentence, Mr. Stanley requested castration along with counseling in return for a lighter sentence and as the best possible cure for his condition. The sentences pronounced by the trial court on November 9, 1998, are reflected in a judgment and commitment order entered on November 19, 1998.

On December 2, 1998, the American Civil Liberties Union of Arkansas, Inc. ("ACLU") filed a motion for leave to intervene in Mr. Stanley's case, seeking to have the condition of castration set aside as unconstitutional and illegal. After the trial court conducted a hearing on the ACLU's motion to intervene, it denied the motion

on the ground that the ACLU lacked standing. The ACLU now appeals that ruling by the trial court.

On appeal, the ACLU argues that the trial court erred in finding that it lacked standing to intervene in Mr. Stanley's criminal case. Alternatively, the ACLU urges this court to exercise its superintending control over inferior state courts in order to reach the merits of this case. Finally, the ACLU asks this court to declare that, when imposed as punishment, castration violates the Eighth and Fourth amendments of the United States Constitution and Article 2, Sections 9 and 15, of the Arkansas Constitution, and is not authorized by Arkansas law.

With regard to the ACLU's first argument, it is a well-settled principle of law that the requirements for "next-friend standing" must be met before a third party may be allowed to intervene in a criminal matter. *Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988). The requirements for next-friend standing are twofold. *Id.* First, the petitioner must show that he or she qualifies as a "next friend." *Id.* That is, the petitioner who claims to be a next friend must have some significant relationship with the real party in interest. *Id.; Whitmore v. Arkansas*, 495 U.S. 149 (1990). There is nothing in the record to suggest the existence of any relationship, much less a significant relationship, between Mr. Stanley and the ACLU. Accordingly, the first requirement for next-friend standing has not been met. The second requirement for next-friend standing is that the person on whose behalf the petitioner seeks to act must be incompetent. *Franz, supra*. Again, there is nothing in the record to indicate that Mr. Stanley is incompetent. It is, therefore, clear that the requirements for next-friend standing have not been met by the ACLU in this case.

The ACLU virtually concedes that it does not meet the next-friend standing requirements set out in *Franz*. Nevertheless, it suggests that because *Franz* involved a defendant who was sentenced to death, which is a legal and constitutional sentence, and this case involves castration, which the ACLU asserts is illegal and unconstitutional, we should "prudentially relax [our] otherwise restrictive standing rules." In other words, the ACLU requests that we relax our standing rules because this case involves an illegal sentence. The ACLU is putting the cart before the horse, by assuming a certain ruling on the merits in order to justify a more relaxed, or nonexis-

tent, standing requirement. As a general rule, we will not reach the merits of a case unless an appellant has standing. *Dixon v. State*, 327 Ark. 105, 937 S.W.2d 642 (1997); *McCoy v. State*, 325 Ark. 155, 925 S.W.2d 391 (1996). We have recognized only one exception to that general rule. In *Franz, supra*, a Catholic priest who counseled inmates at the Department of Correction petitioned to intervene as a next friend after Mr. Ronald Gene Simmons was convicted of capital murder and sentenced to death. The Reverend Louis J. Franz asked for a stay of execution and asked that we make appeal mandatory in death cases. *Franz, supra*. Although we held that the Reverend Franz did not have standing as a next friend, we proceeded to consider the merits of that case. *Franz, supra*. Our reason for doing so was clearly stated: " '[T]he penalty for death is different in kind from any other punishment imposed under our system of criminal justice.' *Gregg v. Georgia*, 428 U.S. 153, 188 (1976). Because of the punishment's uniqueness and irreversibility, we choose to state clearly the law in Arkansas regarding the waiver of appeal in death cases." *Franz, supra*. Under the very limited circumstances presented by the *Franz* case, including the fact that it dealt with the death penalty, we chose to disregard a lack of standing and reach the merits of the case. The ACLU now asks us to also disregard a lack of standing in the case of a suspended sentence that is conditioned in part upon castration. We decline to do so because such a sentence does not involve the unique and irreversible penalty of death, which is different in kind from any other punishment. Standing must remain a strong threshold requirement where third parties seek to intervene in lawsuits.

Finally, the ACLU contends that we should exercise our superintending control over all inferior courts of this state in order to reach the merits of this case. Article 7, section 4, of the Arkansas Constitution provides in pertinent part:

> The Supreme Court, except in cases otherwise provided by this Constitution, shall have appellate jurisdiction only, which shall be coextensive with the State, under such restrictions as from time to time may be prescribed by law. It shall have a general superintending control over all inferior courts of law and equity; and, in aid of its appellate and supervisory jurisdiction, it shall have power to issue writs of error and supersedeas, certiorari, habeas corpus, prohibition, mandamus, and quo warranto, and, other remedial writs, and to hear and determine the same. Its judges shall be

> conservators of the peace throughout the State, and shall severally have power to issue any of the aforesaid writs.

Likewise, Arkansas Code Annotated section 16-10-101(a) (Repl. 1994) states that:

> The Arkansas Supreme Court shall have general superintending control over the administration of justice in all courts of the state of Arkansas. The Chief Justice of the Supreme Court shall be directly responsible for the efficient operation of the judicial branch and of its constituent courts and for the expeditious dispatch of litigation therein and the proper conduct of the business of the court.

While we have never specifically defined the boundaries of our "superintending control" under Article 7, section 4, of the Arkansas Constitution, we have cited that constitutional provision in several cases. *See e.g. Simpson v. Sheriff of Dallas County*, 33 Ark. 277, 968 S.W.2d 614 (1998) (Article 7, section 4, of the Arkansas Constitution confers on the supreme court the authority to entertain and grant petitions for writs of habeas corpus filed originally in the supreme court); *Comm. on Judicial Discipline/Disability v. Digby*, 303 Ark. 24, 792 S.W.2d 594 (1990) (power is given to the supreme court by Ark. Const. art. 7, § 4, to supervise lower courts, but nothing is said about supervision of an agency such as the commission); *State v. Howard*, 251 Ark. 551, 473 S.W.2d 443 (1971) (petition for certiorari granted to review allegations that the respondent was improperly and unconstitutionally elected as special judge of the circuit court); *Robinson v. Robinson*, 218 Ark. 526, 237 S.W.2d 20 (1951) (reliance upon our power of superintending control over trial courts to transfer case to a different division of Pulaski County Chancery Court); *Levy v. Albright*, 204 Ark. 657, 163 S.W.2d 529 (1942) (writ of seizure issued by judge of the supreme court quashed because the writs mentioned in Ark. Const. art. 7, § 4, have no relation to search and seizure warrants). However, we have never relied upon our superintending control over the courts of this state in order to reach the merits of a criminal case, and we will not do so now. Article 7, section 4, of the Arkansas Constitution is not so broad that it gives a third party the right to intervene in the merits of a criminal case against another person.

Because we hold that the trial court properly concluded that the ACLU lacked standing to intervene in Mr. Stanley's criminal case, we do not reach the merits of the ACLU's underlying claim

that castration as punishment for crime violates the United States and Arkansas Constitutions and is not authorized by Arkansas law.

Affirmed.

BROWN and THORNTON, JJ., dissent.

GLAZE, J., concurs.

GLAZE, J. concurs, but disagrees with the majority opinion's analysis of *Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988), where it submits the *Franz* court disregarded ACLU's lack of standing to reach the merits of the case because the case involved the death penalty. The *Franz* court was able to reach the merits because the defendant, Ronald Gene Simmons, appeared and made a formal response on the issues decided. *See State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999), GLAZE, J. dissenting.

CORBIN and SMITH, JJ., join in this concurrence.

ROBERT L. BROWN, Justice, dissenting. The court today refuses to address the issue of whether a court-ordered castration should be allowed to take place. A surgical castration will now be performed on James Stanley, even though the General Assembly has not authorized this procedure which, in the absence of legislative approval, is plainly illegal. Castration by the government is a procedure which is fraught with historical, moral, social, medical, and penal implications and overtones. This court should not approve the procedure by judicial silence, but should confront the issue head on.

According to my research, one state specifically permits surgical castration of sex offenders, which is generally defined as the surgical removal of the testes. That state is Texas, which enacted its law in 1997. *See* Tex. Gov. Code. Ann. § 501.061 (West 1998). The Texas statute provides that certain procedures must be followed, including a specific, written request by the offender and a psychological examination prior to the surgery. Four other states authorize chemical hormonal treatment by statute to reduce or eliminate the sex drive and add that these provisions will not apply if the offender voluntarily undergoes surgical castration. *See* Fla. Stat. Ann. § 794.0235 (Supp. 2000); Cal. Penal Code § 645 (Deering 1998); Iowa Code Ann. § 903B.1 (Supp. 1999); and La. Rev. Stat. Ann. § 15:538 (Supp. 1999). Two states, Georgia and Montana, authorize

hormonal chemical treatment by statute and do not cite surgical castration as an alternative. *See* Ga. Code Ann. § 42-9-44.2 (Michie 1997) and § 16-6-4 (Michie 1999); Mont. Code Ann. § 45-5-512 and § 46-18-201 (West 1999). In each of these jurisdictions, chemical or surgical castration has been authorized by legislative act.

Stanley argues in his brief that surgical castration falls within the category of "available medical or psychiatric treatment," which the General Assembly does permit a trial court to require as a condition of a suspended sentence. *See* Ark. Code Ann. § 5-4-303(c)(4) (Supp. 1999). I disagree. Surgical removal of the testes is a unique and permanent punishment, pure and simple, which the General Assembly should expressly authorize before it is used by our trial courts. To argue that the General Assembly was aware that this language would include surgical castration is ludicrous.

I agree that the ACLU does not have standing in this case. That, however, should not decide this matter because the result of the majority's decision is to allow the castration to proceed. In *Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988), a waiver of appeal in a death case was the issue before this court. A Roman Catholic priest sought to appeal the death sentence on behalf of Ronald Gene Simmons. We held that he had no standing to do so, but we then went forward and reviewed the matter. We said:

> Because of the punishment's uniqueness and irreversibility, we choose to state clearly the law in Arkansas regarding the waiver of appeal in death cases.

*Franz*, 296 Ark. at 186, 754 S.W.2d at 842. Surgical castration is also unique and irreversible. In addition, unlike the death sentence, it is not a penalty authorized by the laws of this state. As we did in *Franz*, this court should state clearly what the law regarding castration is.

The Supreme Court of South Carolina had a similar case in 1985. *See Brown v. South Carolina*, 326 S.E.2d 410 (S.C. 1985). In *Brown*, three defendants all agreed to surgical castration in exchange for reduced prison sentences. All three waived appeals. The matter, nevertheless, was reviewed by the South Carolina Supreme Court, and in a *per curiam* opinion, the court summarily reversed the sentences for violation of the state's public policy as derived from the state constitution, legislative statutes, and judicial opinions. The

court concluded that the sentences were illegal and void as cruel and unusual punishment and mutilation, and remanded the matter for resentencing. The issue of standing was not even discussed. In South Carolina, at least, there was recognition of the severe public policy implications of allowing surgical castration to proceed when there is no authority for doing so.

Before this court wades into such treacherous waters, it should be assured that due consideration has been given to all of the ramifications. It should also be convinced that proper procedures and standards are in place to accomplish the castration. A few questions that ought to be considered are obvious:

- Should the General Assembly consider chemical hormonal medications as an alternative to surgical castration?
- Should the defendant be given a psychological examination before agreeing to castration, as is done in Texas?
- What steps have been taken to assure that the defendant's consent to castration is an informed consent?
- What is the potential liability of the surgeon who performs the castration?
- If castration is deemed "treatment," must it be made available to other sex offenders who are currently incarcerated?
- Castration may be a cheaper alternative to long term incarceration, but which is the more effective deterrent? (Apparently, surgical castration may not completely eliminate the sex drive in all cases.)
- What safeguards are in place to protect against abuse?

*See generally* J. Michael Bailey, *The Science and Ethics of Castration: Lessons from the Morse Case*, 92 Nw. U. L. REV. 1225 (1998); William Winslade, *Castrating Pedophiles Convicted of Sex Offenses Against Children: New Treatment or Old Punishment?*, 51 SMU L. REV. 349 (1998); Kari A. Vanderzyl, *Castration as an Alternative to Incarceration: An Impotent Approach to the Punishment of Sex Offenders*, 15 N. ILL. U. L. REV. 107 (1994).

Surely society as a whole through its representatives in the General Assembly should have an opportunity to consider whether surgical castration of sexual offenders or hormonal chemical treatment is desirable before the trial courts weigh in and begin authorizing the procedure. To allow the bartering of body parts for

reduced prison time is a grave matter and warrants thorough scrutiny.

I would stop castrations in this state until the General Assembly has had a full opportunity to consider and approve the procedure. For these reasons, I dissent.

THORNTON, J., joins.