765 A.2d 396 (2000)
In the Matter of R.B., Appellant.
Superior Court of Pennsylvania.
Submitted August 21, 2000.
Filed December 26, 2000.
Iva C. Dougherty, Reading, for appellant.
Nicholas C. Stroumbakis, Reading, for Com., participating party.
Before MUSMANNO, TODD and TAMILIA, JJ.
TAMILIA, J.:
¶ 1 R.B., a juvenile, appeals from the Order of the trial court requiring him to remain in his placement at Alternative Rehabilitation Communities, Inc. ("ARC") and to undergo an evaluation at Johns Hopkins University Hospital ("Johns Hopkins") to determine his receptivity to pharmacological intervention. The Order further required ARC to ensure that R.B. has a patient advocate available to him at the hospital.
R.B. was born on July 12, 1982. In April, 1998, he was charged with Theft, 18 Pa.C.S.A. § 3921(a) and Receiving Stolen Property, 18 Pa.C.S.A. § 3925(a). A psychiatrist concluded that R.B. was mentally ill, but not legally insane. On April 30, 1998, R.B. entered a guilty but mentally ill admission to one count of simple assault and one count of terroristic threats. [Thereafter, the trial court adjudicated R.B. delinquent.] On May 18, 1998, R.B. was placed at [ARC]. Following periodic review hearings, R.B. has remained in placement at ARC.
While in placement[,] R.B. has undergone counseling. During therapy he revealed that he had been sexually victimized by his family[,] that he had molested young girls, and that once again he has cravings to sexually assault little girls.
ARC submitted a report to the court for the February, 2000, review hearing which recommended that R.B. continue in placement at ARC and that he undergo *397 an evaluation at Johns Hopkins to determine his receptivity to pharmacological intervention. At the end of the review proceeding the court entered the following Order:
AND NOW, this 17th day of February, 2000, the Court orders that R.B. continue in treatment at ARC. He is to cooperate with an evaluation at Johns Hopkins and with Dr. Berlin to determine his receptivity to pharmacological intervention. The Court furthermore provides that ARC shall take all steps to ensure that R.B. has a patient advocate available to him when he is at Johns Hopkins in order to determine his receptivity to pharmacological treatment as well as his understanding of the matters which are being asked of him.
R.B. filed a Motion for Reconsideration which the court denied. This appeal followed.
(Trial Court Opinion, Grim, J., 4/25/2000, at 1-2.)
¶ 2 R.B. now claims that the trial court abused its discretion in ordering him, "a mentally ill seventeen-year old, to cooperate with an evaluation for pharmacological intervention with Depo Provera, the "chemical castration" cure." (Appellant's brief at 4.) In this regard, appellant asserts that (a) the trial court lacked the authority to order his cooperation with chemical castration procedures, (b) the Order was not warranted by the evidence, (c) appellant is not capable of giving informed consent to the procedure, and (d) the Order requiring appellant's cooperation with the evaluation is an ex post facto enhancement of his prior sentence.
¶ 3 An Order of disposition in a juvenile matter is within the sound discretion of the trial court and will not be disturbed by this Court absent an abuse of discretion. In re Love, 435 Pa.Super. 555, 646 A.2d 1233 (1994). The authority of the trial court over a delinquent child is set forth in the Juvenile Act[1] which provides that the trial court may make any order of disposition determined to be "consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation, and welfare, which disposition shall, as appropriate to the individual circumstances of the child's case, provide balanced attention to the protection of the community ... [and] the development of competencies to enable the child to become a responsible and productive member of the community." 42 Pa. C.S.A. § 6352(a).
¶ 4 We find the trial court abused its discretion in modifying its prior Order of disposition to include evaluation of a manner of treatment which effect on a juvenile has not been validated and has not been verified by studies with proven results for adolescents. Our review of Pennsylvania statutory and case law on the use of medical castration and Depo-Provera discloses no discussion of this issue, and a survey of the cases and laws of other jurisdictions reveals that where it has become an issue in the courts, it has not met with a favorable reception. People v. Gauntlett, 134 Mich.App. 737, 352 N.W.2d 310, modified, 419 Mich. 909, 353 N.W.2d 463 (1984); State v. Brown, 284 S.C. 407, 326 S.E.2d 410 (1985). It is not of great significance that the 17-year-old child agreed to the evaluation when the need to control his sexual proclivities is a paradigm of his treatment protocol. Even following release, the treatment protocol, if introduced, would require extensive follow-up and supervision including lifelong adherence to the drug program which could not be pursued by juvenile court beyond its age jurisdiction of 18 or at the latest, 21. This alone would make such a treatment modality unconstitutional as beyond the limits of probation. While the juvenile court would minimize the effect of its Order by suggesting it is only for evaluation and not treatment and that use of Depo-Provera would only be ordered if appellant *398 was fully informed of its effect and consented, the limited intelligence and deprived condition of appellant coupled with his mental condition and present medicated treatment makes it dubious that he can truly give an informed consent. The use of Depo Provera as a condition of probation was exhaustively covered in an article in the Dayton Law Review in 1986.[2] William Green reviewed medical and legal research in this regard and as authority for the general legal response to this modality of probation.
First, there was no statutory authorization for treating sex offenders with the drug. The court was unwilling to interpret the state probation statute, which allowed trial courts at their discretion to impose `other lawful conditions,' to permit the use of Depo-Provera. Michigan case law, the drug's experimental status, and its `alphabet of adverse reactions from acne to cancer to weight gain' cast doubt on its validity as a probation condition. Second, the professional literature demonstrated that Depo Provera had not `gained acceptance in the medical community as a safe and reliable medical procedure.' Third, Depo-Provera's experimental status, the limited professional literature on its use, the limited availability of the drug, and the content of the judge's order made it virtually impossible for the defendant to perform the probation condition.
Id. at 10 (footnotes omitted); quoting Gauntlett, supra.
¶ 5 John Hopkins University Hospital is noted for its progressive work in treatment of sexual dysfunction, and while recognizing John Hopkins to be on the cutting edge of problems of sexual dysfunction, but with no convincing evidence the pharmacological approach will be effective to resolve appellant's problems, we cannot permit the juvenile to make such a portentous decision to enter the John Hopkins program on the very meager and slim information available to the hearing judge. While his counselors believe this to be a viable treatment with appropriate safeguards, the evidence of record indicates the approach to be one experimental in nature and usually the last option available when less dangerous and potentially harmful means have yet to be explored.
¶ 6 More recently, this issue has been revisited by legislators and courts which generally have not resolved it in favor of its application. California became the first state to approve chemical castration as a response to repeat sexual predators, following which other states have dealt with surgical and chemical castration through legislation in various ways. A review of such legislation was rendered in the case of American Civil Liberties Union of Ark., Inc. v. State of Arkansas, 339 Ark. 314, 5 S.W.3d 418 (1999). In that case, while the majority opinion addressed only the issue of the ACLU's standing, Justice Robert L. Brown dissented to the court's refusal to address the issue of whether court-ordered castration should be permitted. Justice Brown wrote:
The court today refuses to address the issue of whether a court-ordered castration should be allowed to take place. A surgical castration will now be performed on James Stanley, even though the General Assembly has not authorized this procedure which, in the absence of legislative approval, is plainly illegal. Castration by the government is a procedure which is fraught with historical, moral, social, medical, and penal implications and overtones. This court should not approve the procedure by judicial silence, but should confront the issue head on.
According to my research, one state specifically permits surgical castration of sex offenders, which is generally defined as the surgical removal of the testes. *399 That state is Texas, which enacted its law in 1997. See Tex.Gov.Code.Ann. § 501.061 (West 1998). The Texas statute provides that certain procedures must be followed, including a specific, written request by the offender and a psychological examination prior to the surgery. Four other states authorize chemical hormonal treatment by statute to reduce or eliminate the sex drive and add that these provisions will not apply if the offender voluntarily undergoes surgical castration. See Fla.Stat.Ann. § 794.0235 (Supp.2000); Cal.Penal Code § 645 (Deering 1998); Iowa Code Ann. § 903B.1 (Supp.1999); and La.Rev.Stat. Ann. § 15:538 (Supp.1999). Two states, Georgia and Montana, authorize hormonal chemical treatment by statute and do not cite surgical castration as an alternative. See Ga.Code ann. § 42-9-44.2 (Michie 1997) and § 16-6-4 (Michie 1999); Mont.Code Ann. § 45-5-512 and § 46-18-201 (West 1999). In each of these jurisdictions, chemical or surgical castration has been authorized by legislative act.
Id. at 319, 5 S.W.3d at 421.
¶ 7 Finally, as recently as May 2000, the subject was revisited in an updated review of 23 articles and legal holdings on the subject in the Journal of Clinical Criminology by David A. Cohen, M.A. (forensic psychiatry).
In summary, it seems that the antiandrogens and triptorelin reviewed produce similar effects in sex offenders suffering from pedophilia. However, as Prentky (1997) has pointed out, there is greater evidence that these drugs are effective in reducing violence than in reducing sex drive, and further study is needed in this area. It is also apparent that the treatment must be undertaken voluntarily, and with concurrent psychotherapy. If treatment is suspended, treatment effects disappear in about three weeks, or slightly longer in older patients, and the potential dangerousness of the offender increases. Surgical castration seems to be an effective method of reducing recidivism, but there is no hard empirical evidence in this area either. I have found no evidence that fluoxetine is a viable treatment for sex offenders of any type, although it has been shown that the drug can be effective in treating non paraphilic sexual addictions and certain paraphilias which are usually not associated with dangerous sex offending.
Cohen, David A., M.A., Forensic Psychiatry, Castration and Drug therapy with Sex offenders, Journal of Clinical Criminology, 5/22/2000.
¶ 8 The Juvenile Act, as broad as it is and with the very broad discretion reposed in the juvenile judge to order disposition, does not reach so far as to permit such a procedure, without more. There is validity in the argument of appellant's counsel that this treatment, as severe as it appears to be, lies in the area of punishment and goes beyond the realm of treatment which conforms with the charges and adjudication for one count of simple assault and one count of terrorist threats. Additionally, the consideration for evaluation by the sexual castration program followed admissions made in the course of counseling and treatment. As such, they could not be the basis for additional charges and enhanced punishment as there is a privileged relationship with the psychologist and psychiatrist who uncovered the prior sexual deviance. There is no doubt that the treatment staff and the court are put to hard choices in a case such as this. Without question, the juvenile court may direct treatment of mental and physical problems of its wards when, in accordance with the Frye[3] test, there is general agreement of the efficacy of treatment. Such is not the case here and this approach should not be undertaken unless validity is established. We must be ever mindful of the statement attributed to former *400 Dean Roscoe Pound, Harvard Law School, that "the powers of the Star Chamber were a trifle in comparison with those of our juvenile courts and courts of domestic relations."[4]
¶ 9 We believe, in the first instance, while this case appears to be interlocutory as it does not comprehend a final order of treatment, but rather, only an evaluation to determine if R.B. is a suitable candidate for such treatment, we must treat it as being final as it modifies a previously entered, final Order of disposition. In addition, since the procedure being evaluated is one which has not been fully validated, it is inappropriate to submit appellant to the John Hopkins program even as a predispositional consideration when placement into the program is impermissible. For that reason we may reach the issue as to appropriateness of the Order. Secondly, before committing the child to the evaluation, the trial court should have received expert testimony, pro and con, as to the efficacy of the treatment in general and more specifically as to the possible harmful consequences such treatment may have on juveniles. Having failed to do so, it was an abuse of discretion to order the evaluation.
¶ 10 Finally, such a treatment protocol for a juvenile is so radical in nature and goes to the essence of basic human behavior as to require the most stringent safeguards in its application necessitating legislation with the accompanying hearings, reviews and study as a policy matter rather than being imposed randomly by courts as a condition of probation, without statutory guidelines.
¶ 11 The Order for evaluation is vacated and the case is remanded for consideration by the trial court of an appropriate treatment disposition within the limits of available and permissible supervision and behavior modification modalities.
¶ 12 Order vacated.
¶ 13 Jurisdiction relinquished.
¶ 14 TODD, J., concurs in the result.
NOTES
[1] See Pa.C.S.A. §§ 6301-6365.
[2] William Green, Depo-Provera, Castration, and the Probation of Rape Offenders: Statutory and Constitutional Issues, University of Dayton Law Review, Vol. 12, No. 1, fall 1986, at 4-7.
[3] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[4] Roscoe Pound, Forward to Pauline V. Young, Social Treatment in Probation and Delinquency xxvii (1937).