J-S09015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.S.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| | : No. 612 WDA 2022 | |

Appeal from the Dispositional Review Order Entered May 20, 2022
In the Court of Common Pleas of Erie County Juvenile Division at No(s):
CP-25-JV0000069-2021,
CP-25-JV0000178-2021

BEFORE:  BENDER, P.J.E., BOWES, J., and SULLIVAN, J.

MEMORANDUM BY BENDER, P.J.E.:                          **FILED: MAY 23, 2023**

D.S.M. ("Appellant"), a minor, appeals from the dispositional review order dated April 20, 2022, and entered on the docket in the Court of Common Pleas of Erie County on May 20, 2022, which modified his placement after he was adjudicated delinquent for multiple offenses.  After careful review, we affirm.

The juvenile court provided the following procedural history and factual background in its Pa.R.A.P. 1925(a) opinion:

> [Appellant] was adjudicated delinquent on August 17, 2021, after previously admitting to several allegations, including criminal mischief, possession of a firearm by a minor, discharge of a firearm into an occupied structure, reckless endangerment, theft

by unlawful taking, and receiving stolen property.[1] The [c]ourt ordered that he be placed at Cornell Abraxas Academy [("Abraxas")] in Morgantown, Pennsylvania. His first four months at Abraxas were relatively positive, but unfortunately[,] by December [of that year], [Appellant's] behavior declined. All told, 12 physical interventions occurred at Abraxas between December 14, 2021, and March 10, 2022. Despite [Appellant's] escalating misconduct, Abraxas recommended at a review hearing[,] held in February of 2022[,] that he remain at the facility, believing it could still treat [Appellant's] behavioral issues. After a few weeks, however, the facility was no longer so optimistic. On March 17, 2022, Abraxas requested his removal, citing instances of aggression, such as attempting an assault on a peer, threatening to "jump" a staff member, and the breaking of a security camera and a large wooden table.

At a disposition hearing held on April 20, 2022, the Commonwealth recommended placement at another secure facility. While counsel for [Appellant] agreed that "Abraxas just didn't work" and "a change of scenery would work best for him[,]" he proposed "[g]etting him back home as a good alternate possibility." [Appellant's] mother proposed that he be released on probation to participate in a summer work experience program, and to engage in counseling with Dr. Parris Baker. Ultimately, the [c]ourt agreed with the Commonwealth's recommendation, continuing the finding of delinquency and ordering him "relocated to a state secure juvenile facility with the first available bed." The [c]ourt found this "to be the least restrictive means to address community protection, victim restoration, mental health and competency development."

Juvenile Court Opinion ("JCO"), 7/27/22, at 1-2 (citations to record and brackets in original omitted).

_____

[1] Appellant's adjudication of delinquency for criminal mischief (18 Pa.C.S. § 3304(a)(2)) was entered at docket no. CP-25-JV-0000069-2021 ("JV 69-2021"). Appellant was adjudicated delinquent for the following offenses at docket no. CP-25-JV-0000178-2021 ("JV 178-2021"): possession of a firearm by a minor (18 Pa.C.S. § 6110.1(a)); discharge of a firearm into an occupied structure (18 Pa.C.S. § 2707.1(a)); and recklessly endangering another person (18 Pa.C.S. § 2705). The charges for theft by unlawful taking (18 Pa.C.S. § 3921(a)) and receiving stolen property (18 Pa.C.S. § 3925(a)) were withdrawn.

The juvenile court entered its April 20, 2022 dispositional review order at both juvenile docket numbers (JV 69-2021 and JV 178-2021) on May 20, 2022. Appellant filed a single, timely notice of appeal on May 20, 2022, listing both docket numbers from which he appeals, followed by a timely, court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant now presents the following issues for our review:

A. Whether the [juvenile] court erred when it determined that Appellant needed further "treatment, rehabilitation and/or supervision" in a more restrictive facility instead of in a less restrictive setting such as a community type of setting (*i.e.*, formal probation with outpatient and/or wrap around services) and/or an independent living type of placement due to Appellant's age and/or other factors considered by the [juvenile c]ourt[?]

B. Whether the [juvenile] court erred when it determined that Appellant's best placement option was Commit to State Placement ([Youth Development Center ("YDC")]) (first bed available), which is further from [Appellant's] home county than other placements that could accomplish the same "treatment, supervision and rehabilitation" goals that focus on education and/or personal safety instead of a less restrictive setting such as a community type of setting (*i.e.*, formal probation with outpatient and/or wrap around services) and/or an independent living type of placement due to Appellant['s] age and/or other factors considered by the [juvenile c]ourt[?]

Appellant's Brief at 5.

Before delving into the merits of Appellant's claims, there are several preliminary matters that demand our attention. First, we must determine whether quashal of this appeal is required, due to Appellant's failure to follow the proper practice under Rule 341(a) of filing separate appeals from an order that resolves issues arising on more than one docket. ***See*** Pa.R.A.P. 341,

Official Note ("Where … one or more orders resolves issues arising on more than one docket or relating to more than one judgment, separate notices of appeal must be filed."); *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018) (requiring quashal of an appeal where the appellant fails to file separate notices of appeal when appealing from a single order that resolves issues arising on more than one trial docket), *overruled in part*, *Commonwealth v. Young*, 265 A.3d 462 (Pa. 2022) (reaffirming *Walker*, but determining that Pa.R.A.P. 902 permits the appellate court, in its discretion, to allow correction of the error where appropriate).

Exceptions to *Walker's* bright-line quashal rule have been established, such as where a breakdown of court operations has occurred. In *Commonwealth v. Stansbury*, 219 A.3d 157 (Pa. Super. 2019), the PCRA court advised the appellant that he could appeal from its order dismissing his PCRA petition pending at two separate docket numbers by filing within thirty days "*a* written *notice* of appeal[.]" *Id.* at 160 (emphasis in original). The lower court also utilized the singular in advising him where to file "[s]aid *notice* of appeal[.]" *Id.* (emphasis in original). "Hence, while *Walker* required that [the a]ppellant file separate notices of appeal at each docket number, the PCRA court informed [him] that he could pursue appellate review by filing a single notice of appeal." *Id.* We concluded that such misstatements regarding the manner in which an appeal could be effectuated amounted to "a breakdown in court operations" such that we could overlook the defective nature of the timely notice of appeal. *Id.* We, therefore, declined to quash

pursuant to **Walker** and addressed the substance of the appeal. **Id. See also Commonwealth v. Larkin**, 235 A.3d 350, 352-54 (Pa. Super. 2020) (*en banc*) (reaffirming **Stansbury** and concluding that a breakdown in the court system occurred where the lower court advised Larkin that he had "thirty (30) days … to file **an** appeal" from an order appearing on two dockets) (emphasis is original).

Similarly, in **Interest of K.M.W.**, 238 A.3d 465 (Pa. Super. 2020), the mother filed a timely single notice of appeal from a decree that involuntarily terminated her parental rights to her minor child on the adoption docket and changed the child's permanency goal to adoption on the dependency docket. **Id.** at 468. The mother listed both lower court docket numbers on her single notice of appeal. **Id.** at 468-69. Notably, the trial court indicated to the mother that she could seek relief by filing a singular appeal from multiple lower court docket numbers. **See id.** at 470 ("This order shall become absolute as of course if **no appeal** is taken, within thirty (30) days, pursuant to Pa.R.A.P. 341.") (emphasis added). We concluded that the trial court's misstatement constituted a breakdown in court operations and, accordingly, declined to quash the appeal. **Id.**

In the matter *sub judice*, Appellant was notified of his right to file "**a** direct appeal[,]" as well as the time constraints for filing such an "**appeal**" in a written post-dispositional rights colloquy signed by Appellant and his counsel

on the date of the dispositional review hearing. *See* Pa.R.J.C.P. 610(D).[2] Throughout the two-paged colloquy, all references to Appellant's right to *an appeal* were consistently made in the singular. There is no indication in the record that the juvenile court ever instructed Appellant to file two separate notices of appeal from its dispositional order which appears on both docket nos. JV 69-2021 and JV 178-2021. We believe the juvenile court's failure to inform Appellant that separate notices of appeal were required to comply with Rule 341(a) and *Walker* constituted a breakdown in court operations. Accordingly, we decline to quash this appeal. *See Int. of K.M.W.*, *supra*, *Larkin*, *supra*, and *Stansbury*, *supra*.[3]

---

[2] Chapter 6, Part B of the Pennsylvania Rules of Juvenile Court Procedure governs the procedures for modifications and reviews of dispositional orders. Rule 610(D) provides that "[a] colloquy and inquiry of post-dispositional rights shall be conducted when a juvenile is aggrieved by a modification of the dispositional order." Pa.R.J.C.P. 610(D).

[3] The Pennsylvania Rules of Juvenile Court Procedure dictate that "[*a*]*fter* entering disposition on the record, the court shall ensure that an attorney has reviewed the post-dispositional rights colloquy with the juvenile … and conduct an *independent inquiry* to determine whether the juvenile understands: (a) the right to file a post-dispositional motion; (b) the right to file an appeal; [and] (c) the time limits for filing a post-dispositional motion and appeal…." Pa.R.J.C.P. 512(C)(1)(a)-(c) (emphasis added). *See also* Pa.R.J.C.P. 610, *Comment* ("For the colloquy and inquiry of post-dispositional rights, see Rule 512(C)."). We note that, in the instant matter, the juvenile court asked Appellant's counsel at the *beginning* of the review hearing whether he went over Appellant's post-dispositional rights with Appellant, to which counsel answered in the affirmative. N.T. Hearing, 4/20/22, at 2. The court then proceeded to ask Appellant, in a general manner, whether he "understood those rights[,]" and whether he had "any questions for [the court] concerning them?" *Id.* No further inquiry regarding Appellant's understanding of his appellate rights took place on the record. We are not convinced that the

Next, we must determine whether the order from which Appellant appealed is appealable, because appealability implicates our jurisdiction. *Interest of J.M.*, 219 A.3d 645, 650 (Pa. Super. 2019). *See also Kulp v. Hrivnak*, 765 A.2d 796, 798 (Pa. Super. 2000) ("[S]ince we lack jurisdiction over an unappealable order[,] it is incumbent on us to determine, *sua sponte* when necessary, whether the appeal is taken from an appealable order."). It is clear that an initial order of disposition is a final order from which a juvenile may appeal as of right. *See In re M.D.*, 839 A.2d 1116, 1118 (Pa. Super. 2003). We have also established that this right to appeal does not extend to review orders that simply maintain the status quo. *Id.* at 1121 ("We hold … that a committed juvenile does not have the right to appeal from a review order that continues his commitment in the same manner and place and that maintains the status quo."). However, we have permitted appeals from review orders in cases where the order modifies the status quo. *See In the Matter of R.B.*, 765 A.2d 396 (Pa. Super. 2000) (determining a dispositional review order that continued the juvenile's placement and ordered him to submit to a medical evaluation was appealable due to the additional requirement of a medical evaluation, as it modified the original dispositional order). *See also In re J.E.D.*, 879 A.2d 288, 291 (Pa. Super. 2005) (concluding that an order modifying the amount of restitution is appealable). Instantly, the order from

juvenile court complied with the mandates of Rules 610 and 512(C) here; however, due to our declining to quash on another basis, we need not reach a determination as to whether the court's failure to strictly comply with Rules 610 and 512(C) also constitutes a breakdown of court operations.

which Appellant appeals terminates his placement at Abraxas and orders his transfer to a more secure, state juvenile facility, which is a clear modification of the manner and place of Appellant's commitment. Hence, we deem this order to be appealable.

Additionally, we question whether the passage of time has rendered this appeal moot.

> As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.

*In re J.A.*, 107 A.3d 799, 811-12 (Pa. Super. 2015) (quoting *In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) (*en banc*) (internal citations and quotations omitted)).

> Nevertheless, this Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

*In re D.A.*, 801 A.2d at 616 (citations omitted).

Instantly, Appellant asks us to reverse the May 20, 2022 dispositional review order transferring him to a more restrictive state secure facility. Unlike the criminal justice system, in which a criminal defendant's judgment of sentence continues without further involvement by the trial court unless

overturned on appeal, a juvenile's disposition "is subject to frequent, mandatory review by the hearing court." ***In re M.D.***, 839 A.2d at 1119. "[I]n the event a judge enters a disposition order that provides for commitment, the judge is ***required*** to review the propriety of that commitment every six months and must also hold a disposition hearing at least every nine months." ***Id.*** (citing 42 Pa.C.S. § 6353) (emphasis in original).

At the time this appeal was filed, Appellant was placed at the Edmund L. Thomas Adolescent Center and was awaiting a bed to become available at a state secured juvenile facility. Appellant's current placement status is unknown. The certified record indicates that a review hearing was scheduled for June 9, 2022, and because of the juvenile court's obligation to hold periodic reviews, it is likely that additional dispositional review hearings have been held since that date. Arguably, therefore, our decision in this appeal may not have any legal force or effect. ***See In re D.A.***, 801 A.2d at 616. Nevertheless, we conclude that we are able to decide this appeal, as it presents questions that are "capable of repetition and apt to elude appellate review," and thus are excepted from the mootness doctrine. ***See In re J.A.***, 107 A.3d at 811-12 (reviewing appeal rendered moot by trial court order entered after review hearing conducted while appeal was pending). We, therefore, proceed to address the merits of this appeal.

In considering Appellant's claims, we remain mindful that "a delinquent's disposition is a duty vested in the discretion of the adjudicating juvenile court." ***In re Love***, 646 A.2d 1233, 1238 (Pa. Super. 1994) (citing

42 Pa.C.S. § 6352). "[T]he discretion of the [j]uvenile [c]ourt implementing a disposition is broad, it is flexible[,] and the [j]uvenile [c]ourt has considerable power to review and modify the commitment, taking into account the rehabilitative progress or lack of it of the juvenile. Without extreme specificity as to the error by the court in imposing the commitment, there can be no basis for setting aside the disposition." *Id.* at 1238 n.5.

We review "a juvenile court's dispositional order directing out-of-home placement for an abuse of discretion." *Interest of D.W.*, 220 A.3d 573, 576 (Pa. Super. 2019) (citation omitted). We will not disturb the disposition implemented by the lower court absent a manifest abuse of discretion. *In re R.D.*, 44 A.3d 657, 681 (Pa. Super. 2012). "It is well settled that, under Pennsylvania law, an abuse of discretion occurs when the court has overridden or misapplied the law, when its judgment is manifestly unreasonable, or when there is insufficient evidence of record to support the court's findings." *Interest of D.W.*, 220 A.3d at 576 (internal brackets and citation omitted). Moreover, we note that "in a juvenile proceeding, the hearing judge sits as the finder of fact. The weight to be assigned the testimony of the witnesses is within the exclusive province of the fact finder." *Id.* (citation omitted).

Here, Appellant contends that the juvenile court erred in terminating his placement at Abraxas and ordering his transfer to the "first bed available" at a state juvenile facility, which is a more restrictive setting. Appellant's Brief at 9. He believes that placement at any YDC was unnecessary for the following reasons: Appellant turned 18 years old during his last placement; Appellant

had an "excellent review" from Abraxas for the time period of August 2021 through December 2021; during the period of December 2021 through February 2022, when the facility alleged Appellant's behavior was "untenable," Appellant and/or his mother reported a number of complaints and/or grievances regarding Appellant's treatment; Appellant had an "excellent review" from the Edmund L. Thomas Adolescent Center between March 2022 and May 2022; Appellant made substantial progress on the community service hours, restitution, educational goals, and therapeutic goals ordered by the juvenile court; Appellant substantially followed the safety plan implemented by the placement facility; and it is in Appellant's best interest for him to return home to his community and supportive family. *Id.* at 10-11.

Appellant asserts that any behavioral issues previously alleged by Abraxas should not overshadow the "excellent reports" later received from the same facility and from the Edmund L. Thomas Adolescent Center. *Id.* at 11. He explains that his bad behavior was a result of abuse that he suffered from the staff at Abraxas and that his grievances against the staff led to retaliation in the form of more abuse towards Appellant. *Id.* "Appellant … lost faith and focus in the staff and treatment goals as a result of that abuse." *Id.* As soon as he was removed from Abraxas, Appellant asserts that he had a "complete and sudden" turnaround and that the trial court should have given this factor stronger consideration. *Id.* Appellant seeks immediate release from any YDC to formal probation with outpatient services and/or placement in an independent living facility, as he believes this would provide him with the

necessary treatment, supervision and rehabilitation, and would allow for him

to be closer geographically to his family. *Id.*

Importantly, we note the following purposes, relevant to this appeal,

underlying the Juvenile Act (42 Pa.C.S. §§ 6301 – 6375):

> (2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.
>
> (3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety, by doing all of the following:
>
>> (i) employing evidence-based practices whenever possible and, in the case of a delinquent child, by using the least restrictive intervention that is consistent with the protection of the community, the imposition of accountability for offenses committed and the rehabilitation, supervision and treatment needs of the child; and
>>
>> (ii) imposing confinement only if necessary and for the minimum amount of time that is consistent with the purposes under paragraphs (1), (1.1) and (2).

42 Pa.C.S. § 6301(b).

Our Supreme Court explained that the General Assembly incorporated

balanced and restorative justice ("BARJ") into the Juvenile Act via Act 33 of

1995 to achieve these articulated goals. *Interest of D.C.D.*, 171 A.3d 727,

738 (Pa. 2017).

> Historically, BARJ stemmed from the clashing methodologies of the retributive justice theory, which prioritizes punishment, and an individual treatment philosophy, which focuses on the

rehabilitation of offenders. BARJ was a compromise in this long debate which brought together aspects of both systems by requiring consideration of community protection, accountability, and competency development.

First, community protection focuses on decreasing the risk to communities and providing communities with tools to manage the behaviors of juvenile offenders. BARJ aims to maintain community safety through developing short-term and long-term goals of changing and controlling juvenile offender behavior while developing mutual respect of citizens within the community. Next, accountability recognizes that a combination of adhering to the rules of the legal system and accepting full responsibility for offensive behavior facilitates positive moral development. The accountability factor helps juvenile offenders to reduce their likelihood of re-offense through acknowledging that their behavior affects other people and creating opportunities for offenders to repair the harm. Finally, competency development allows for juvenile offenders to forge skills that will allow them to contribute positively to the well-being of a community and ultimately allow offenders to gain a sense of belonging in a community.

*Id.* at 738-39 (internal citations omitted).

It is evident from the juvenile court's opinion that it gave considerable thought to these BARJ principles and the goals of the Juvenile Act in reaching its determination regarding Appellant's placement. In support of its decision to transfer Appellant to a state facility, the court opined:

First, placement on probation with restrictions or in an … independent-living facility would not have furthered the BARJ goals of community protection, accountability, and competency development. Given [Appellant's] increasingly belligerent behavior at Abraxas, which the [c]ourt found was "not sufficiently explained[,]" [placing Appellant] in an environment with less supervision would pose a substantial and unjustifiable risk to those around him, just as his behavior at Abraxas posed a substantial risk to both students and staff. While [Appellant] and his counsel may suggest that his inappropriate behavior was a result of factors unique to Abraxas[,] the [c]ourt was not willing to risk the safety of others on the hope that [Appellant] would be

- 13 -

more successful in a less restrictive environment, at least without a proven track record of good behavior….

Indeed, at the hearing, the [c]ourt noted positively that it was impressed with [Appellant's] ability to control his behavior at the Edmund L. Thomas Adolescent Center for the past 34 days, but given the repeated and serious instances of misconduct that occurred at Abraxas, that fact alone did not convince the [c]ourt that community protection (or other BARJ goals for that matter) were yet best served by a less restrictive placement. If [Appellant] is correct that his errant behavior is the result of factors unique to Abraxas, then further time at a more secure facility will provide more reliable, empirical evidence from which to accurately assess whether [he] remains a threat to himself or others outside of that facility.

That leads to the second BARJ purpose, accountability. From December 2021 through March of 2022, [Appellant] did not demonstrate an ability to adhere to the rules of the legal system or accept full responsibility for his offensive behavior. Abraxas – itself a controlled environment – proved inadequate to provide the necessary accountability. During his time at Abraxas, his likelihood of re-offense increased, not decreased. It defies common sense to believe a less secure environment than Abraxas could provide greater accountability where that facility could not.

Counsel for [Appellant] asserted at the disposition hearing under review that release on probation would not be a "reward" because [Appellant] would be coming home with strict requirements. But it is difficult for the [c]ourt to conceive how it could be perceived by [Appellant] as anything other than a reward. In any event, it would not provide accountability for the misconduct that occurred at Abraxas. To be sure, punishment and reward in the retributive justice sense is not a goal of BARJ, yet the accountability factor recognizes that a placement is, in part, a test of whether the juvenile will reoffend in the real world and whether they have adequately acknowledged that their behavior affects others, as well as an opportunity to seek rehabilitative treatment. [Appellant] had not proven that he achieved these goals at Abraxas, and so, there was insufficient credible evidence to suggest a less restrictive environment would yield better results than the empirically proven treatments a secure state facility can offer.

As to the final BARJ purpose, competency, the [c]ourt noted at the hearing that [Appellant], "despite admonishment by the [c]ourt, continued in a significantly escalated fashion to engage in misconduct at the facility[,] establishing for the [c]ourt that he has, as [of] yet, failed to sufficiently incorporate into his life all of the things – especially aggression and anger, all of the things that [he's] been taught to overcome those issues." [It] further observed that "what's concerning to the [c]ourt is [Appellant] doesn't have great recollection and perceives the potential that he might have blacked out during one of these things indicating a level of aggression at a significant level." [Appellant's] testimony and the other evidence presented at the disposition hearing underscored the potential severity of his psychological trauma and established that he had yet to adequately address, from a therapeutic standpoint, the root causes of his aggression. A secure facility is better equipped to provide [Appellant] with the therapeutic tools he needs [to] further explore and put into practice these therapeutic goals.

[Appellant's] mother suggested [that] a summer work program and counseling from a professor with a Ph.D. and a background in social work would be able to satisfy [Appellant's] therapeutic needs, but the [c]ourt found [that] the level of aggression exhibited by [Appellant] "would not be sufficiently addressed by the good-hearted efforts by Dr. Parris Baker and by Gary Horton through the UECDC Dream Build Live Program." Rather, the [c]ourt found that a state placement program would employ better evidence-based programs and practices to meet [Appellant's] significant psychological and behavioral needs. Moreover, a more traditional and empirically-proven academic setting was necessary given [Appellant's] lackluster academic performance at Abraxas.

JCO at 5-7 (citations to record omitted).

Additionally, the juvenile court noted that Appellant's age should not have any "talismanic bearing" on its determination regarding placement. *Id.* at 7. Appellant has not cited any caselaw indicating that out-of-home placement is categorically less appropriate for a juvenile who attains the age of 18. Rather, as the juvenile court explained, "[o]ur Supreme Court has eschewed such absolute rules, emphasizing 'juvenile courts are granted broad

discretion in weighing the BARJ factors as appropriate to the individual child.'" *Id.* at 8 (quoting *D.C.D.*, 171 A.3d at 742). Moreover, we acknowledge that the juvenile court will retain jurisdiction over Appellant until the age of 21. *See* 42 Pa.C.S. § 6302 (defining "child" as "an individual who … is under the age of 21 years who committed an act of delinquency before reaching the age of 18 years"). Instantly, the court concluded that Appellant "has not yet exhibited the requisite maturity to be released on any less restrictive placement." JCO at 8.

In response to Appellant's claim that the court's disposition was inconsistent with his supervision, rehabilitation, and welfare needs, and that returning home is in Appellant's best interest, the court stated: "Given his behavior at Abraxas, [Appellant] is currently in need of more supervision, not less, and a secure state facility is best equipped to provide such supervision." *Id.* It further emphasized that "such a facility is in the best position to provide the extensive therapeutic care that is necessary for [Appellant's] rehabilitation. Thus, his overall welfare and well-being is best served in a secure and structured facility for now." *Id.*

The juvenile court also specifically addressed Appellant's contention that he had complied with most of his education and/or counseling goals, noting that it made contrary factual findings. *Id.*

> [Appellant] was in decline academically, getting grades as low as 47% in both math and science and a 49% in reading. Nor were these grades the product of a good faith attempt at academic achievement. The [c]ourt found that, "other than art and gym, [Appellant] showed … little effort to engage in any way in the

academic programming." Therapeutically, he fared little better. Although his counselor testified there was some progression, she also noted he only "sometimes" incorporated the coping skills discussed in therapy. That is a rather generous assessment considering the numerous instances of misconduct recorded at Abraxas since December of 2021. To reiterate, these instances of misconduct[] were not minor; they involved the breaking of a wooden table [and] a camera, the communication of threats, and several instances of physical restraint. In short, the assertion that [Appellant] was meeting his target education and therapeutic goals is belied by the factual record before the [c]ourt at the disposition hearing.

*Id.* at 8-9 (citations to record omitted).

Finally, in response to Appellant's contention that his regression was the product of Abraxas staff and supervisors who allegedly harassed and bullied him, and that his misbehavior should therefore not be held against him, the juvenile court opined:

The [c]ourt did not ignore these concerning allegations, either when they were first brought to the [c]ourt's attention or at the disposition hearing under review. As the [c]ourt reminded [Appellant's] mother on the record, in a prior proceeding, it had taken the somewhat unprecedented step of admonishing Abraxas staff and ordering that certain individuals not have any direct contact with [Appellant]. That being said, the [c]ourt explained at the disposition hearing under review that, even accepting these allegations as true, [Appellant] nonetheless failed to abide by the [c]ourt's admonishment to [Appellant] to stop such behaviors even after the problematic individuals were removed from the equation. On the contrary, the aggressive behavior continued to escalate.

In failing to incorporate the therapeutic lessons he had learned in therapy, [Appellant] had shown that further and extensive treatment for his aggression and greater security measures were necessary for his supervision, rehabilitation, treatment, and welfare. It therefore was not an abuse of discretion to order placement at a secure facility even in light of the concerning allegations against employees at Abraxas. In terminating his placement at Abraxas, [Appellant] will have an opportunity at a

second chance to prove his maturity in a secure and safe environment that can meet his substantial academic and psychological needs.

*Id.* at 9 (citations to record omitted). We conclude that the juvenile court's findings are well-supported by the record, and we discern no abuse of discretion in the court's modification to Appellant's placement.

Accordingly, we affirm the dispositional review order entered by the juvenile court on May 20, 2022.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/23/2023